# HERNANDEZ *v.* NEW YORK

No. 89–7645.   Argued February 25, 1991—Decided May 28, 1991

KENNEDY, J., announced the judgment of the Court and delivered an opinion, in which REHNQUIST, C. J., and WHITE and SOUTER, JJ., joined. O'CONNOR, J., filed an opinion concurring in the judgment, in which SCALIA, J., joined, *post*, p. 372. BLACKMUN, J., filed a dissenting opinion, *post*, p. 375. STEVENS, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 375.

*Kenneth Kimerling* argued the cause for petitioner. With him on the briefs were *Ruben Franco* and *Arthur Baer*.

*Jay M. Cohen* argued the cause for respondent. With him on the brief were *Charles J. Hynes, Peter A. Weinstein, Carol Teague Schwartzkopf,* and *Victor Barall.**

---

*\*E. Richard Larson, Antonia Hernandez,* and *Juan Cartagena* filed a brief for the Mexican American Legal Defense and Educational Fund et al. as *amici curiae* urging reversal.

JUSTICE KENNEDY announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, JUSTICE WHITE and JUSTICE SOUTER join.

Petitioner Dionisio Hernandez asks us to review the New York state courts' rejection of his claim that the prosecutor in his criminal trial exercised peremptory challenges to exclude Latinos from the jury by reason of their ethnicity. If true, the prosecutor's discriminatory use of peremptory strikes would violate the Equal Protection Clause as interpreted by our decision in *Batson* v. *Kentucky*, 476 U. S. 79 (1986). We must determine whether the prosecutor offered a race-neutral basis for challenging Latino potential jurors and, if so, whether the state courts' decision to accept the prosecutor's explanation should be sustained.

Petitioner and respondent both use the term "Latino" in their briefs to this Court. The *amicus* brief employs instead the term "Hispanic," and the parties referred to the excluded jurors by that term in the trial court. Both words appear in the state-court opinions. No attempt has been made at a distinction by the parties and we make no attempt to distinguish the terms in this opinion. We will refer to the excluded venirepersons as Latinos in deference to the terminology preferred by the parties before the Court.

## I

The case comes to us on direct review of petitioner's convictions on two counts of attempted murder and two counts of criminal possession of a weapon. On a Brooklyn street, petitioner fired several shots at Charlene Calloway and her mother, Ada Saline. Calloway suffered three gunshot wounds. Petitioner missed Saline and instead hit two men in a nearby restaurant. The victims survived the incident.

The trial was held in the New York Supreme Court, Kings County. We concern ourselves here only with the jury selection process and the proper application of *Batson*, which had been handed down before the trial took place. After 63 potential jurors had been questioned and 9 had been empan-

eled, defense counsel objected that the prosecutor had used four peremptory challenges to exclude Latino potential jurors. Two of the Latino venirepersons challenged by the prosecutor had brothers who had been convicted of crimes, and the brother of one of those potential jurors was being prosecuted by the same District Attorney's office for a probation violation. Petitioner does not press his *Batson* claim with respect to those prospective jurors, and we concentrate on the other two excluded individuals.

After petitioner raised his *Batson* objection, the prosecutor did not wait for a ruling on whether petitioner had established a prima facie case of racial discrimination. Instead, the prosecutor volunteered his reasons for striking the jurors in question. He explained:

> "Your honor, my reason for rejecting the—these two jurors—I'm not certain as to whether they're Hispanics. I didn't notice how many Hispanics had been called to the panel, but my reason for rejecting these two is I feel very uncertain that they would be able to listen and follow the interpreter." App. 3.

After an interruption by defense counsel, the prosecutor continued:

> "We talked to them for a long time; the Court talked to them, I talked to them. I believe that in their heart they will try to follow it, but I felt there was a great deal of uncertainty as to whether they could accept the interpreter as the final arbiter of what was said by each of the witnesses, especially where there were going to be Spanish-speaking witnesses, and I didn't feel, when I asked them whether or not they could accept the interpreter's translation of it, I didn't feel that they could. They each looked away from me and said with some hesitancy that they would try, not that they could, but that they would try to follow the interpreter, and I feel that

in a case where the interpreter will be for the main witnesses, they would have an undue impact upon the jury." *Id.*, at 3–4.[1]

Defense counsel moved for a mistrial "based on the conduct of the District Attorney," and the prosecutor requested a chance to call a supervisor to the courtroom before the judge's ruling.

Following a recess, defense counsel renewed his motion, which the trial court denied. Discussion of the objection continued, however, and the prosecutor explained that he would have no motive to exclude Latinos from the jury:

"[T]his case, involves four complainants. Each of the complainants is Hispanic. All my witnesses, that is, civilian witnesses, are going to be Hispanic. I have absolutely no reason—there's no reason for me to want to exclude Hispanics because all the parties involved are Hispanic, and I certainly would have no reason to do that." *Id.*, at 5–6.[2]

---

[1] The prosecutor later gave the same explanation for challenging the bilingual potential jurors:

". . . I felt that from their answers they would be hard pressed to accept what the interpreter said as the final thing on what the record would be, and I even had to ask the Judge to question them on that, and their answers were—I thought they both indicated that they would have trouble, although their final answer was they could do it. I just felt from the hesitancy in their answers and their lack of eye contact that they would not be able to do it." App. 6.

[2] The trial judge appears to have accepted the prosecutor's reasoning as to his motivation. In response to a charge by defense counsel that the prosecutor excluded Latino jurors out of fear that they would sympathize with the defendant, the judge stated:

"The victims are all Hispanics, he said, and, therefore, they will be testifying for the People, so there could be sympathy for them as well as for the defendant, so he said [it] would not seem logical in this case he would look to throw off Hispanics, because I don't think that his logic is wrong. They might feel sorry for a guy who's had a bullet hole through him, he's Hispanic, so they may relate to him more than they'll relate to the shooter." *Id.*, at 8.

After further interchange among the judge and attorneys, the trial court again rejected petitioner's claim. *Id.*, at 12.

On appeal, the New York Supreme Court, Appellate Division, noted that though the ethnicity of one challenged bilingual juror remained uncertain, the prosecutor had challenged the only three prospective jurors with definite Hispanic surnames. 140 App. Div. 2d 543, 528 N. Y. S. 2d 625 (1986). The court ruled that this fact made out a prima facie showing of discrimination. The court affirmed the trial court's rejection of petitioner's *Batson* claim, however, on the ground that the prosecutor had offered race-neutral explanations for the peremptory strikes sufficient to rebut petitioner's prima facie case.

The New York Court of Appeals also affirmed the judgment, holding that the prosecutor had offered a legitimate basis for challenging the individuals in question and deferring to the factual findings of the lower New York courts. 75 N. Y. 2d 350, 552 N. E. 2d 621 (1990). Two judges dissented, concluding that on this record, analyzed in the light of standards they would adopt as a matter of state constitutional law, the prosecutor's exclusion of the bilingual potential jurors should not have been permitted. We granted certiorari, 498 U. S. 894 (1990), and now affirm.

## II

In *Batson,* we outlined a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause. 476 U. S., at 96–98. The analysis set forth in *Batson* permits prompt rulings on objections to peremptory challenges without substantial disruption of the jury selection process. First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. *Id.*, at 96–97. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-

neutral explanation for striking the jurors in question. *Id.*, at 97–98. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.*, at 98. This three-step inquiry delimits our consideration of the arguments raised by petitioner.

A

The prosecutor defended his use of peremptory strikes without any prompting or inquiry from the trial court. As a result, the trial court had no occasion to rule that petitioner had or had not made a prima facie showing of intentional discrimination. This departure from the normal course of proceeding need not concern us. We explained in the context of employment discrimination litigation under Title VII of the Civil Rights Act of 1964 that "[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." *United States Postal Service Bd. of Governors* v. *Aikens,* 460 U. S. 711, 715 (1983). The same principle applies under *Batson.* Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.

B

Petitioner contends that the reasons given by the prosecutor for challenging the two bilingual jurors were not race neutral. In evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law. A court addressing this issue must keep in mind the fundamental principle that "official action will not be held unconstitutional solely because it results in a racially dispropor-

tionate impact. . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 264–265 (1977); see also *Washington* v. *Davis*, 426 U. S. 229, 239 (1976). " 'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected . . . a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator of Mass.* v. *Feeney*, 442 U. S. 256, 279 (1979) (footnote and citation omitted); see also *McCleskey* v. *Kemp*, 481 U. S. 279, 297–299 (1987).

A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.

Petitioner argues that Spanish-language ability bears a close relation to ethnicity, and that, as a consequence, it violates the Equal Protection Clause to exercise a peremptory challenge on the ground that a Latino potential juror speaks Spanish. He points to the high correlation between Spanish-language ability and ethnicity in New York, where the case was tried. We need not address that argument here, for the prosecutor did not rely on language ability without more, but explained that the specific responses and the demeanor of the two individuals during *voir dire* caused him to doubt their ability to defer to the official translation of Spanish-language testimony.[3]

---

[3] Respondent cites *United States* v. *Perez*, 658 F. 2d 654 (CA9 1981), which illustrates the sort of problems that may arise where a juror fails to accept the official translation of foreign-language testimony. In *Perez*, the following interchange occurred:

The prosecutor here offered a race-neutral basis for these peremptory strikes. As explained by the prosecutor, the challenges rested neither on the intention to exclude Latino or bilingual jurors, nor on stereotypical assumptions about Latinos or bilinguals. The prosecutor's articulated basis for these challenges divided potential jurors into two classes: those whose conduct during *voir dire* would persuade him they might have difficulty in accepting the translator's rendition of Spanish-language testimony and those potential jurors who gave no such reason for doubt. Each category would include both Latinos and non-Latinos. While the prosecutor's criterion might well result in the disproportionate removal of prospective Latino jurors, that disproportionate impact does not turn the prosecutor's actions into a *per se* violation of the Equal Protection Clause.

Petitioner contends that despite the prosecutor's focus on the individual responses of these jurors, his reason for the peremptory strikes has the effect of a pure, language-based

---

"DOROTHY KIM (JUROR NO. 8): Your Honor, is it proper to ask the interpreter a question? I'm uncertain about the word La Vado *[sic]*. You say that is a bar.

"THE COURT: The Court cannot permit jurors to ask questions directly. If you want to phrase your question to me—

"DOROTHY KIM: I understood it to be a restroom. I could better believe they would meet in a restroom rather than a public bar if he is undercover.

"THE COURT: These are matters for you to consider. If you have any misunderstanding of what the witness testified to, tell the Court now what you didn't understand and we'll place the—

"DOROTHY KIM: I understand the word La Vado *[sic]*—I thought it meant restroom. She translates it as bar.

"MS. IANZITI: In the first place, the jurors are not to listen to the Spanish but to the English. I am a certified court interpreter.

"DOROTHY KIM: You're an idiot." *Id.*, at 662. Upon further questioning, "the witness indicated that none of the conversations in issue occurred in the restroom." *Id.*, at 663. The juror later explained that she had said " 'it's an idiom' " rather than " 'you're an idiot,' " but she was nevertheless dismissed from the jury. *Ibid.*

reason because "[a]ny honest bilingual juror would have answered the prosecutor in the exact same way." Brief for Petitioner 14. Petitioner asserts that a bilingual juror would hesitate in answering questions like those asked by the judge and prosecutor due to the difficulty of ignoring the actual Spanish-language testimony. In his view, no more can be expected than a commitment by a prospective juror to try to follow the interpreter's translation.

But even if we knew that a high percentage of bilingual jurors would hesitate in answering questions like these and, as a consequence, would be excluded under the prosecutor's criterion, that fact alone would not cause the criterion to fail the race-neutrality test. As will be discussed below, disparate impact should be given appropriate weight in determining whether the prosecutor acted with a forbidden intent, but it will not be conclusive in the preliminary race-neutrality step of the *Batson* inquiry. An argument relating to the impact of a classification does not alone show its purpose. See *Personnel Administrator of Mass.* v. *Feeney, supra,* at 279. Equal protection analysis turns on the intended consequences of government classifications. Unless the government actor adopted a criterion with the intent of causing the impact asserted, that impact itself does not violate the principle of race neutrality. Nothing in the prosecutor's explanation shows that he chose to exclude jurors who hesitated in answering questions about following the interpreter *because* he wanted to prevent bilingual Latinos from serving on the jury.

If we deemed the prosecutor's reason for striking these jurors a racial classification on its face, it would follow that a trial judge could not excuse for cause a juror whose hesitation convinced the judge of the juror's inability to accept the official translation of foreign-language testimony. If the explanation is not race neutral for the prosecutor, it is no more so for the trial judge. While the reason offered by the prosecutor for a peremptory strike need not rise to the level of a

challenge for cause, *Batson*, 476 U. S., at 97, the fact that it corresponds to a valid for-cause challenge will demonstrate its race-neutral character.

## C

Once the prosecutor offers a race-neutral basis for his exercise of peremptory challenges, "[t]he trial court then [has] the duty to determine if the defendant has established purposeful discrimination." *Id.*, at 98. While the disproportionate impact on Latinos resulting from the prosecutor's criterion for excluding these jurors does not answer the race-neutrality inquiry, it does have relevance to the trial court's decision on this question. "[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [classification] bears more heavily on one race than another." *Washington* v. *Davis*, 426 U. S., at 242. If a prosecutor articulates a basis for a peremptory challenge that results in the disproportionate exclusion of members of a certain race, the trial judge may consider that fact as evidence that the prosecutor's stated reason constitutes a pretext for racial discrimination.

In the context of this trial, the prosecutor's frank admission that his ground for excusing these jurors related to their ability to speak and understand Spanish raised a plausible, though not a necessary, inference that language might be a pretext for what in fact were race-based peremptory challenges. This was not a case where by some rare coincidence a juror happened to speak the same language as a key witness, in a community where few others spoke that tongue. If it were, the explanation that the juror could have undue influence on jury deliberations might be accepted without concern that a racial generalization had come into play. But this trial took place in a community with a substantial Latino population, and petitioner and other interested parties were members of that ethnic group. It would be common knowledge in the locality that a significant percentage of the Latino

population speaks fluent Spanish, and that many consider it their preferred language, the one chosen for personal communi-cation, the one selected for speaking with the most precision and power, the one used to define the self.

The trial judge can consider these and other factors when deciding whether a prosecutor intended to discriminate. For example, though petitioner did not suggest the alternative to the trial court here, Spanish-speaking jurors could be permitted to advise the judge in a discreet way of any concerns with the translation during the course of trial. A prosecutor's persistence in the desire to exclude Spanish-speaking jurors despite this measure could be taken into account in determining whether to accept a race-neutral explanation for the challenge.

The trial judge in this case chose to believe the prosecutor's race-neutral explanation for striking the two jurors in question, rejecting petitioner's assertion that the reasons were pretextual. In *Batson,* we explained that the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal:

> "In a recent Title VII sex discrimination case, we stated that 'a finding of intentional discrimination is a finding of fact' entitled to appropriate deference by a reviewing court. *Anderson* v. *Bessemer City,* 470 U. S. 564, 573 (1985). Since the trial judge's findings in the context under consideration here largely turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference. *Id.,* at 575–576." *Batson, supra,* at 98, n. 21.

*Batson*'s treatment of intent to discriminate as a pure issue of fact, subject to review under a deferential standard, accords with our treatment of that issue in other equal protection cases. See *Hunter* v. *Underwood,* 471 U. S. 222, 229 (1985) (Court of Appeals correctly found that District Court committed clear error in concluding state constitutional provision

was not adopted out of racial animus); *Rogers* v. *Lodge*, 458 U. S. 613, 622–623 (1982) (clearly-erroneous standard applies to review of finding that at-large voting system was maintained for discriminatory purposes); *Dayton Bd. of Ed.* v. *Brinkman*, 443 U. S. 526, 534 (1979) (affirming Court of Appeals' conclusion that District Court's failure to find the intentional operation of a dual school system was clearly erroneous); *Akins* v. *Texas*, 325 U. S. 398, 401–402 (1945) (great respect accorded to findings of state court in discriminatory jury selection case); see also *Miller* v. *Fenton*, 474 U. S. 104, 113 (1985). As *Batson*'s citation to *Anderson* suggests, it also corresponds with our treatment of the intent inquiry under Title VII. See *Pullman-Standard* v. *Swint*, 456 U. S. 273, 293 (1982).

Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in *Batson*, the finding "largely will turn on evaluation of credibility." 476 U. S., at 98, n. 21. In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province." *Wainwright* v. *Witt*, 469 U. S. 412, 428 (1985), citing *Patton* v. *Yount*, 467 U. S. 1025, 1038 (1984).

The precise formula used for review of factfindings, of course, depends on the context. *Anderson* was a federal civil case, and we there explained that a federal appellate court reviews the finding of a district court on the question of intent to discriminate under Federal Rule of Civil Procedure 52(a), which permits factual findings to be set aside only if clearly erroneous. While no comparable rule exists for federal criminal cases, we have held that the same stand-

ard should apply to review of findings in criminal cases on issues other than guilt. *Maine* v. *Taylor*, 477 U. S. 131, 145 (1986); *Campbell* v. *United States*, 373 U. S. 487, 493 (1963). See also 2 C. Wright, Federal Practice and Procedure § 374 (2d ed. 1982 and Supp. 1990). On federal habeas review of a state conviction, 28 U. S. C. § 2254(d) requires the federal courts to accord state-court factual findings a presumption of correctness.

This case comes to us on direct review of the state-court judgment. No statute or rule governs our review of facts found by state courts in cases with this posture. The reasons justifying a deferential standard of review in other contexts, however, apply with equal force to our review of a state trial court's findings of fact made in connection with a federal constitutional claim. Our cases have indicated that, in the absence of exceptional circumstances, we would defer to state-court factual findings, even when those findings relate to a constitutional issue. See *324 Liquor Corp.* v. *Duffy*, 479 U. S. 335, 351 (1987); *California Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97, 111–112 (1980); see also *Time, Inc.* v. *Firestone*, 424 U. S. 448, 463 (1976); *General Motors Corp.* v. *Washington*, 377 U. S. 436, 441–442 (1964) (quoting *Norton Co.* v. *Department of Revenue of Ill.*, 340 U. S. 534, 537–538 (1951)); *Bantam Books, Inc.* v. *Sullivan*, 372 U. S. 58, 68 (1963); *Lloyd A. Fry Roofing Co.* v. *Wood*, 344 U. S. 157, 160 (1952). Moreover, "an issue does not lose its factual character merely because its resolution is dispositive of the ultimate constitutional question." *Miller* v. *Fenton, supra*, at 113 (citing *Dayton Bd. of Ed.* v. *Brinkman, supra*).

Petitioner advocates "independent" appellate review of a trial court's rejection of a *Batson* claim. We have difficulty understanding the nature of the review petitioner would have us conduct. Petitioner explains that "[i]ndependent review requires the appellate court to accept the findings of historical fact and credibility of the lower court unless they are

clearly erroneous. Then, based on these facts, the appellate court independently determines whether there has been discrimination." Reply Brief for Petitioner 17. But if an appellate court accepts a trial court's finding that a prosecutor's race-neutral explanation for his peremptory challenges should be believed, we fail to see how the appellate court nevertheless could find discrimination. The credibility of the prosecutor's explanation goes to the heart of the equal protection analysis, and once that has been settled, there seems nothing left to review.

Petitioner seeks support for his argument in *Bose Corp.* v. *Consumers Union of United States, Inc.,* 466 U. S. 485 (1984), and *Miller* v. *Fenton, supra. Bose Corp.* dealt with review of a trial court's finding of "actual malice," a First Amendment precondition to liability in a defamation case, holding that an appellate court "must exercise independent judgment and determine whether the record establishes actual malice with convincing clarity." 466 U. S., at 514. *Miller* accorded similar treatment to a finding that a confession was voluntary. 474 U. S., at 110. Those cases have no relevance to the matter before us. They turn on the Court's determination that findings of voluntariness or actual malice involve legal, as well as factual, elements. See *Miller, supra,* at 115–117; *Bose Corp., supra,* at 501–502; see also *Harte-Hanks Communications, Inc.* v. *Connaughton,* 491 U. S. 657, 685 (1989) ("The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law"). Whether a prosecutor intended to discriminate on the basis of race in challenging potential jurors is, as *Batson* recognized, a question of historical fact.

Petitioner also looks to a line of this Court's decisions reviewing state-court challenges to jury selection procedures. Many of these cases, following *Norris* v. *Alabama,* 294 U. S. 587 (1935), have emphasized this Court's duty to "analyze the facts in order that the appropriate enforcement of the federal

right may be assured," *id.*, at 590, or to "make independent inquiry and determination of the disputed facts," *Pierre* v. *Louisiana*, 306 U. S. 354, 358 (1939). See, *e. g.*, *Whitus* v. *Georgia*, 385 U. S. 545, 550 (1967); *Avery* v. *Georgia*, 345 U. S. 559, 561 (1953); *Patton* v. *Mississippi*, 332 U. S. 463, 466 (1947); *Smith* v. *Texas*, 311 U. S. 128, 130 (1940). The review provided for in those cases, however, leaves room for deference to state-court factual determinations, in particular on issues of credibility. For instance, in *Akins* v. *Texas*, 325 U. S. 398 (1945), we said:

> "[T]he transcript of the evidence presents certain inconsistencies and conflicts of testimony in regard to limiting the number of Negroes on the grand jury. Therefore, the trier of fact who heard the witnesses in full and observed their demeanor on the stand has a better opportunity than a reviewing court to reach a correct conclusion as to the existence of that type of discrimination. While our duty, in reviewing a conviction upon a complaint that the procedure through which it was obtained violates due process and equal protection under the Fourteenth Amendment, calls for our examination of evidence to determine for ourselves whether a federal constitutional right has been denied, expressly or in substance and effect, *Norris* v. *Alabama*, 294 U. S. 587, 589–90; *Smith* v. *Texas*, 311 U. S. 128, 130, we accord in that examination great respect to the conclusions of the state judiciary, *Pierre* v. *Louisiana*, 306 U. S. 354, 358. That respect leads us to accept the conclusion of the trier on disputed issues 'unless it is so lacking in support in the evidence that to give it effect would work that fundamental unfairness which is at war with due process,' *Lisenba* v. *California*, 314 U. S. 219, 238, or equal protection. Cf. *Ashcraft* v. *Tennessee*, 322 U. S. 143, 152, 153; *Malinski* v. *New York*, 324 U. S. 401, 404." *Id.*, at 401–402.

Other cases in the *Norris* line also express our respect for factual findings made by state courts. See *Whitus, supra,* at 550; *Pierre, supra,* at 358.

In the case before us, we decline to overturn the state trial court's finding on the issue of discriminatory intent unless convinced that its determination was clearly erroneous. It "would pervert the concept of federalism," *Bose Corp., supra,* at 499, to conduct a more searching review of findings made in state trial court than we conduct with respect to federal district court findings. As a general matter, we think the *Norris* line of cases reconcilable with this clear error standard of review. In those cases, the evidence was such that a "reviewing court on the entire evidence [would be] left with the definite and firm conviction that a mistake ha[d] been committed." *United States* v. *United States Gypsum Co.,* 333 U. S. 364, 395 (1948). For instance, in *Norris* itself, uncontradicted testimony showed that "no negro had served on any grand or petit jury in [Jackson County, Alabama,] within the memory of witnesses who had lived there all their lives." 294 U. S., at 591; see also *Avery* v. *Georgia, supra,* at 560–561; *Patton* v. *Mississippi, supra,* at 466; *Smith* v. *Texas, supra,* at 131. In circumstances such as those, a finding of no discrimination was simply too incredible to be accepted by this Court.

We discern no clear error in the state trial court's determination that the prosecutor did not discriminate on the basis of the ethnicity of Latino jurors. We have said that "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson* v. *Bessemer City,* 470 U. S. 564, 574 (1985). The trial court took a permissible view of the evidence in crediting the prosecutor's explanation. Apart from the prosecutor's demeanor, which of course we have no opportunity to review, the court could have relied on the facts that the prosecutor defended his use of peremptory challenges without being asked to do so by the judge, that he did not know which

jurors were Latinos, and that the ethnicity of the victims and prosecution witnesses tended to undercut any motive to exclude Latinos from the jury. Any of these factors could be taken as evidence of the prosecutor's sincerity. The trial court, moreover, could rely on the fact that only three challenged jurors can with confidence be identified as Latinos, and that the prosecutor had a verifiable and legitimate explanation for two of those challenges. Given these factors, that the prosecutor also excluded one or two Latino venirepersons on the basis of a subjective criterion having a disproportionate impact on Latinos does not leave us with a "definite and firm conviction that a mistake has been committed." *United States* v. *United States Gypsum Co., supra,* at 395.

## D

Language permits an individual to express both a personal identity and membership in a community, and those who share a common language may interact in ways more intimate than those without this bond. Bilinguals, in a sense, inhabit two communities, and serve to bring them closer. Indeed, some scholarly comment suggests that people proficient in two languages may not at times think in one language to the exclusion of the other. The analogy is that of a high-hurdler, who combines the ability to sprint and to jump to accomplish a third feat with characteristics of its own, rather than two separate functions. Grosjean, The Bilingual as a Competent but Specific Speaker-Hearer, 6 J. Multilingual & Multicultural Development 467 (1985). This is not to say that the cognitive processes and reactions of those who speak two languages are susceptible of easy generalization, for even the term "bilingual" does not describe a uniform category. It is a simple word for a more complex phenomenon with many distinct categories and subdivisions. Sánchez, Our Linguistic and Social Context, in Spanish in the United States 9, 12 (J. Amastae & L. Elías-Olivares eds. 1982); Dodson, Second Language Acquisition and Bilingual Devel-

opment: A Theoretical Framework, 6 J. Multilingual & Multicultural Development 325, 326–327 (1985).

Our decision today does not imply that exclusion of bilinguals from jury service is wise, or even that it is constitutional in all cases. It is a harsh paradox that one may become proficient enough in English to participate in trial, see, *e. g.*, 28 U. S. C. §§ 1865(b)(2), (3) (English-language ability required for federal jury service), only to encounter disqualification because he knows a second language as well. As the Court observed in a somewhat related context: "Mere knowledge of [a foreign] language cannot reasonably be regarded as harmful. Heretofore it has been commonly looked upon as helpful and desirable." *Meyer* v. *Nebraska*, 262 U. S. 390, 400 (1923).

Just as shared language can serve to foster community, language differences can be a source of division. Language elicits a response from others, ranging from admiration and respect, to distance and alienation, to ridicule and scorn. Reactions of the latter type all too often result from or initiate racial hostility. In holding that a race-neutral reason for a peremptory challenge means a reason other than race, we do not resolve the more difficult question of the breadth with which the concept of race should be defined for equal protection purposes. We would face a quite different case if the prosecutor had justified his peremptory challenges with the explanation that he did not want Spanish-speaking jurors. It may well be, for certain ethnic groups and in some communities, that proficiency in a particular language, like skin color, should be treated as a surrogate for race under an equal protection analysis. Cf. *Yu Cong Eng* v. *Trinidad*, 271 U. S. 500 (1926) (law prohibiting keeping business records in other than specified languages violated equal protection rights of Chinese businessmen); *Meyer* v. *Nebraska*, *supra* (striking down law prohibiting grade schools from teaching languages other than English). And, as we make clear, a policy of striking all who speak a given language,

without regard to the particular circumstances of the trial or the individual responses of the jurors, may be found by the trial judge to be a pretext for racial discrimination. But that case is not before us.

## III

We find no error in the application by the New York courts of the three-step *Batson* analysis. The standard inquiry into the objecting party's prima facie case was unnecessary given the course of proceedings in the trial court. The state courts came to the proper conclusion that the prosecutor offered a race-neutral basis for his exercise of peremptory challenges. The trial court did not commit clear error in choosing to believe the reasons given by the prosecutor.

*Affirmed.*

JUSTICE O'CONNOR, with whom JUSTICE SCALIA joins, concurring in the judgment.

I agree with the plurality that we review for clear error the trial court's finding as to discriminatory intent, and agree with its analysis of this issue. I agree also that the finding of no discriminatory intent was not clearly erroneous in this case. I write separately because I believe that the plurality opinion goes further than it needs to in assessing the constitutionality of the prosecutor's asserted justification for his peremptory strikes.

Upon resolution of the factfinding questions, this case is straightforward. Hernandez asserts an equal protection violation under the rule of *Batson* v. *Kentucky*, 476 U. S. 79 (1986). In order to demonstrate such a violation, Hernandez must prove that the prosecutor intentionally discriminated against Hispanic jurors on the basis of their race. The trial court found that the prosecutor did not have such intent, and that determination is not clearly erroneous. Hernandez has failed to meet his burden.

An unwavering line of cases from this Court holds that a violation of the Equal Protection Clause requires state action

motivated by discriminatory intent; the disproportionate effects of state action are not sufficient to establish such a violation. In *Washington* v. *Davis*, 426 U. S. 229, 239 (1976), we explained that "our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact." "[A] defendant who alleges an equal protection violation has the burden of proving 'the existence of purposeful discrimination.'" *McCleskey* v. *Kemp*, 481 U. S. 279, 292 (1987). See also *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 264–265 (1977); *Keyes* v. *School Dist. No. 1, Denver, Colo.*, 413 U. S. 189, 198 (1973); *Wright* v. *Rockefeller*, 376 U. S. 52, 56–57 (1964).

We have recognized the discriminatory intent requirement explicitly in the context of jury selection. Thus, "[a] purpose to discriminate must be present which may be proven by systematic exclusion of eligible jurymen of the proscribed race or by unequal application of the law to such an extent as to show intentional discrimination." *Akins* v. *Texas*, 325 U. S. 398, 403–404 (1945). See also *Alexander* v. *Louisiana*, 405 U. S. 625, 628–629 (1972); *Whitus* v. *Georgia*, 385 U. S. 545, 549–550 (1967); *Norris* v. *Alabama*, 294 U. S. 587, 589 (1935); *Neal* v. *Delaware*, 103 U. S. 370, 394 (1881). The point was made clearly in *Batson* itself: "As in any equal protection case, the 'burden is, of course,' on the defendant who alleges discriminatory selection . . . 'to prove the existence of purposeful discrimination.'" 476 U. S., at 93, quoting *Whitus, supra*, at 550.

Consistent with our established equal protection jurisprudence, a peremptory strike will constitute a *Batson* violation only if the prosecutor struck a juror *because of the juror's race*. "[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors *solely on account of their race* or on the assumption that *[Hispanic] jurors as a group* will be unable impartially to consider the State's case." *Batson,*

*supra*, at 89 (emphasis added). See also *Powers* v. *Ohio*, 499 U. S. 400, 409 (1991) ("[T]he Equal Protection Clause prohibits a prosecutor from using the State's peremptory challenges to exclude otherwise qualified and unbiased persons from the petit jury solely by reason of their race"). *Batson*'s requirement of a race-neutral explanation means an explanation other than race.

In *Washington* v. *Davis*, *supra*, we outlined the dangers of a rule that would allow an equal protection violation on a finding of mere disproportionate effect. Such a rule would give rise to an unending stream of constitutional challenges:

> "A rule that [state action] designed to serve neutral ends is nevertheless invalid, absent compelling justification, if in practice it benefits or burdens one race more than another would be far reaching and would raise serious questions about, and perhaps invalidate, a whole range of tax, welfare, public service, regulatory, and licensing statutes that may be more burdensome to the poor and to the average black than to the more affluent white." *Id.*, at 248.

In the same way, a rule that disproportionate effect might be sufficient for an equal protection violation in the use of peremptory strikes runs the serious risk of turning *voir dire* into a full-blown disparate impact trial, with statistical evidence and expert testimony on the discriminatory effect of any particular nonracial classification. In addition to creating unacceptable delays in the trial process, such a practice would be antithetical to the nature and purpose of the peremptory challenge. Absent intentional discrimination violative of the Equal Protection Clause, parties should be free to exercise their peremptory strikes for any reason, or no reason at all. The peremptory challenge is, "as Blackstone says, an arbitrary and capricious right; and it must be exercised with full freedom, or it fails of its full purpose." *Lewis* v. *United States*, 146 U. S. 370, 378 (1892) (internal quotation marks omitted).

In this case, the prosecutor's asserted justification for striking certain Hispanic jurors was his uncertainty about the jurors' ability to accept the official translation of trial testimony. App. 3–4. If this truly was the purpose of the strikes, they were not strikes because of race, and therefore did not violate the Equal Protection Clause under *Batson*. They may have acted like strikes based on race, but they were *not* based on race. No matter how closely tied or significantly correlated to race the explanation for a peremptory strike may be, the strike does not implicate the Equal Protection Clause unless it is based on race. That is the distinction between disproportionate effect, which is not sufficient to constitute an equal protection violation, and intentional discrimination, which is.

Disproportionate effect may, of course, constitute evidence of intentional discrimination. The trial court may, because of such effect, disbelieve the prosecutor and find that the asserted justification is merely a pretext for intentional race-based discrimination. See *Batson, supra,* at 93. But if, as in this case, the trial court believes the prosecutor's nonracial justification, and that finding is not clearly erroneous, that is the end of the matter. *Batson* does not require that a prosecutor justify a jury strike at the level of a for-cause challenge. It also does not require that the justification be unrelated to race. *Batson* requires only that the prosecutor's reason for striking a juror not *be* the juror's race.

JUSTICE BLACKMUN, dissenting.

I dissent, essentially for the reasons stated by JUSTICE STEVENS in Part II of his opinion, *post,* at 378–379.

JUSTICE STEVENS, with whom JUSTICE MARSHALL joins, dissenting.

A violation of the Equal Protection Clause requires wl at our cases characterize as proof of "discriminatory purpose." By definition, however, a prima facie case is one that is established by the requisite proof of invidious intent. Unless

the prosecutor comes forward with an explanation for his peremptories that is sufficient to rebut that prima facie case, no additional evidence of racial animus is required to establish an equal protection violation. In my opinion, the Court therefore errs when it concludes that a defendant's *Batson* challenge fails whenever the prosecutor advances a nonpretextual justification that is not facially discriminatory.

I

In *Batson* v. *Kentucky*, 476 U. S. 79 (1986), we held that "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination" sufficient to satisfy the defendant's burden of proving an equal protection violation. *Id.*, at 97. "Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation." *Ibid.* If the prosecutor offers no explanation, the defendant has succeeded in establishing an equal protection violation based on the evidence of invidious intent that gave rise to the prima facie case. If the prosecutor seeks to dispel the inference of discriminatory intent, in order to succeed his explanation "need not rise to the level justifying exercise of a challenge for cause." *Ibid.* However, the prosecutor's justification must identify "'legitimate reasons'" that are "related to the particular case to be tried" and sufficiently persuasive to "rebu[t] a defendant's prima facie case." *Id.*, at 98, and n. 20.

An avowed justification that has a significant disproportionate impact will rarely qualify as a legitimate, race-neutral reason sufficient to rebut the prima facie case because disparate impact is itself evidence of discriminatory purpose. See *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 265–266 (1977); *Washington* v. *Davis*, 426 U. S. 229, 242 (1976). An explanation based on a concern that can easily be accommodated by means less drastic than excluding the challenged venireperson from the petit jury will also generally not qualify as a legitimate reason be-

cause it is not in fact "related to the particular case to be tried." *Batson*, 476 U. S., at 98; see *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 425 (1975) (availability of nondiscriminatory alternative is evidence of discriminatory motive). Cf. also *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 507 (1989) (State cannot make race-based distinctions if there are equally effective nondiscriminatory alternatives). And, as in any other equal protection challenge to a government classification, a justification that is frivolous or illegitimate should not suffice to rebut the prima facie case. See, *e. g.*, *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432 (1985); *id.*, at 452 (STEVENS, J., concurring); *Western & Southern Life Ins. Co.* v. *State Bd. of Equalization of Cal.*, 451 U. S. 648, 677 (1981) (STEVENS, J., dissenting).

If any explanation, no matter how insubstantial and no matter how great its disparate impact, could rebut a prima facie inference of discrimination provided only that the explanation itself was not facially discriminatory, "the Equal Protection Clause 'would be but a vain and illusory requirement.'" *Batson*, 476 U. S., at 98 (quoting *Norris* v. *Alabama*, 294 U. S. 587, 598 (1935)). The Court mistakenly believes that it is compelled to reach this result because an equal protection violation requires discriminatory purpose. See *ante*, at 359–360, 364. The Court overlooks, however, the fact that the "discriminatory purpose" which characterizes violations of the Equal Protection Clause can sometimes be established by objective evidence that is consistent with a decisionmaker's honest belief that his motive was entirely benign. "Frequently the most probative evidence of intent will be objective evidence of what actually happened," *Washington* v. *Davis*, 426 U. S., at 253 (STEVENS, J., concurring), including evidence of disparate impact. See, *e. g.*, *Yick Wo* v. *Hopkins*, 118 U. S. 356 (1886); *Gomillion* v. *Lightfoot*, 364 U. S. 339 (1960); *Sims* v. *Georgia*, 389 U. S. 404, 407 (1967); *Turner* v. *Fouche*, 396 U. S. 346, 359 (1970). The line between discriminatory purpose and discriminatory impact is

neither as bright nor as critical as the Court appears to believe.[1]

The Court therefore errs in focusing the entire inquiry on the subjective state of mind of the prosecutor. In jury selection challenges, the requisite invidious intent is established once the defendant makes out a prima facie case. No additional evidence of this intent is necessary unless the explanation provided by the prosecutor is sufficiently powerful to rebut the prima facie proof of discriminatory purpose. By requiring that the prosecutor's explanation itself provide additional, direct evidence of discriminatory motive, the Court has imposed on the defendant the added requirement that he generate evidence of the prosecutor's actual subjective intent to discriminate. Neither *Batson* nor our other equal protection holdings demand such a heightened quantum of proof.

## II

Applying the principles outlined above to the facts of this case, I would reject the prosecutor's explanation without

---

[1] In *Washington* v. *Davis*, 426 U. S. 229 (1976) (concurring opinion), I noted that the term "purposeful discrimination" has been used in many different contexts.

"Although it may be proper to use the same language to describe the constitutional claim in each of these contexts, the burden of proving a prima facie case may well involve differing evidentiary considerations. The extent of deference that one pays to the trial court's determination of the factual issue, and indeed, the extent to which one characterizes the intent issue as a question of fact or a question of law, will vary in different contexts.

"Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. . . .

"My point in making this observation is to suggest that the line between discriminatory purpose and discriminatory impact is not nearly as bright, and perhaps not quite as critical, as the reader of the Court's opinion might assume. I agree, of course, that a constitutional issue does not arise every time some disproportionate impact is shown. On the other hand, when the disproportion is as dramatic as in *Gomillion* v. *Lightfoot*, 364 U. S. 339, or *Yick Wo* v. *Hopkins*, 118 U. S. 356, it really does not matter whether the standard is phrased in terms of purpose or effect." *Id.*, at 253–254.

reaching the question whether the explanation was pretextual. Neither the Court nor respondent disputes that petitioner made out a prima facie case. See *ante*, at 359. Even assuming the prosecutor's explanation in rebuttal was advanced in good faith, the justification proffered was insufficient to dispel the existing inference of racial animus.

The prosecutor's explanation was insufficient for three reasons. First, the justification would inevitably result in a disproportionate disqualification of Spanish-speaking venirepersons. An explanation that is "race neutral" on its face is nonetheless unacceptable if it is merely a proxy for a discriminatory practice. Second, the prosecutor's concern could easily have been accommodated by less drastic means. As is the practice in many jurisdictions, the jury could have been instructed that the official translation alone is evidence; bilingual jurors could have been instructed to bring to the attention of the judge any disagreements they might have with the translation so that any disputes could be resolved by the court. See, *e. g.*, *United States* v. *Perez*, 658 F. 2d 654, 662–663 (CA9 1981).[2] Third, if the prosecutor's concern was valid and substantiated by the record, it would have supported a challenge for cause. The fact that the prosecutor did not make any such challenge, see App. 9, should disqualify him from advancing the concern as a justification for a peremptory challenge.

Each of these reasons considered alone might not render insufficient the prosecutor's facially neutral explanation. In combination, however, they persuade me that his explanation should have been rejected as a matter of law. Accordingly, I respectfully dissent.

---

[2] An even more effective solution would be to employ a translator, who is the only person who hears the witness' words and who simultaneously translates them into English, thus permitting the jury to hear only the official translation.