**Opinion issued October 11, 2012**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-08-00138-CR

_____

**JAMES BLACKMAN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 230th District Court**
**Harris County, Texas**
**Trial Court Case No. 1121171**

---

## DISSENTING OPINION

The majority holds that the trial court erred in denying appellant James

Blackman's *Batson* challenge to the State's use of a peremptory strike. I

respectfully dissent. I would hold that the trial court did not err, and I would affirm the judgment of the trial court.

Appellant bases his *Batson* challenge on the State's peremptory strike of venire member J. Fortune, one of three African Americans in the available pool of potential jurors, one of whom was seated on the jury. Appellant contends, and the majority agrees, that the trial court erred in overruling his *Batson* challenge to the State's use of a peremptory strike against Fortune because the State's reasons for striking her constituted a "pretext for racial bias." I strongly disagree.

In *Batson*, the United States Supreme Court held that using peremptory challenges to exclude persons from a jury because of their race violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Batson v. Kentucky*, 476 U.S. 79, 86, 106 S. Ct. 1712, 1717 (1986); *Herron v. State*, 86 S.W.3d 621, 630 (Tex. Crim. App. 2002). Thus, in making a *Batson* challenge to the prosecution's exercise of a peremptory strike, "[t]he defendant must demonstrate, by a preponderance of the evidence, that the prosecutor indulged in purposeful discrimination against a member of a constitutionally protected class. . . ." *Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008). First, the defendant must make a prima facie showing of racial discrimination. *Id.* (quoting *Purkett v. Elem*, 514 U.S. 765, 767, 115 S. Ct. 1769, 1770 (1995)). Second, if he does so, the burden of production shifts to the

2

prosecutor to come forward with a race-neutral explanation for the strike. *Id.* Third, the trial court must determine whether the defendant has proved purposeful racial discrimination. *Id.* When the trial court goes directly to a *Batson* hearing on neutral reasons and conducts a full hearing, without making a finding on the prima facie showing of racial discrimination, the question of whether a prima facie case was made becomes moot, and the reviewing court addresses only the second and third steps in the analysis. *Id.* at 447 & n.11. Thus, appellate review concentrates on the prosecutor's race-neutral explanation for the peremptory strike and the defendant's rebuttal of the prosecutor's explanation by a preponderance of the evidence. *See id.*

"[T]he question presented at the third stage of the *Batson* inquiry is 'whether the defendant has shown purposeful discrimination.'" *Snyder v. Louisiana*, 552 U.S. 472, 484–85, 128 S. Ct. 1203, 1212 (2008) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 277, 125 S. Ct. 2317, 2346 (2005) (Thomas, J., dissenting)). At this step, "[t]he trial court has a pivotal role in evaluating *Batson* claims." *Id.* at 477, 128 S. Ct. at 1208. This step involves an evaluation of the prosecutor's credibility, and "the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge." *Id.* (quoting *Hernandez v. New York*, 500 U.S. 352, 365, 111 S. Ct. 1859, 1869 (1991) (plurality opinion)). "In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor

(*e.g.*, nervousness, inattention), making the trial court's first-hand observations of even greater importance." *Id.* In such a case, the trial court must evaluate "not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor. . . . [T]hese determinations of credibility and demeanor lie 'peculiarly within a trial judge's province.'" *Id.* (quoting *Hernandez*, 500 U.S. at 365, 111 S. Ct. at 1869). Thus, except in "exceptional circumstances," the reviewing court defers to the trial court. *Id.*

"[A] reviewing court should examine a trial court's conclusion that a facially race-neutral explanation for a peremptory challenge is genuine, rather than a pretext, with great deference, reversing only when that conclusion is, in view of the record as a whole, clearly erroneous." *Watkins*, 245 S.W.3d at 448. An appellate court misapplies the "clearly erroneous" standard of appellate review when it substitutes its judgment for that of the trial court in deciding that the prosecutor's facially race-neutral explanation for striking a venire member was a pretext. *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004). This is because "[t]he term 'pretext' is solely a question of fact; there is no issue of law." *Id.* Thus, "the trial court [is] in the best position to make that credibility determination." *Id.* To make the determination of whether the prosecutor's race-neutral explanation for his strike was a pretext, the reviewing court should consider

the entire voir dire record, not merely those arguments or considerations the parties specifically called to the trial court's attention. *Watkins*, 245 S.W.3d at 448.

The trial court's factual findings are presumed to be sound unless the defendant rebuts the presumption of correctness by clear and convincing evidence. *Id.* at 448 n.16 (quoting *Miller-El*, 545 U.S. at 240, 125 S. Ct. at 2325).

The Court of Criminal Appeals has cautioned,

> The [United States] Supreme Court also clarified [in *Miller-El v. Dretke*] that reviewing courts must take the proponent of a peremptory challenge at his word when he identifies a race-neutral explanation for his challenge. If that explanation proves circumstantially suspect, the reviewing court is not to supply some other plausible, race-neutral basis for the challenge. "If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false."

*Id.* at 449 n.19 (quoting *Miller-El*, 545 U.S. at 252, 125 S. Ct. at 2332). By the same reasoning, if the prosecutor identifies a race-neutral explanation for his challenge to a venire member that the trial court does *not* find circumstantially suspect, the trial corut's finding of racial neutrality does not fade into insignificance because an appellate court can imagine a reason that the prosecutor's explanation for the strike might have been false. Rather, the defendant must rebut the trial court's findings by "clear and convincing evidence." *Miller-El*, 545 U.S. at 240, 125 S. Ct. at 2325; *Watkins*, 245 S.W.3d at 448.

Here, in direct contravention of the standard of review, the majority substitutes itself for the trial court in deciding that the prosecutor's facially race-

5

neutral explanation for striking venire member Fortune was a pretext. *See Gibson*, 144 S.W.3d at 534 (holding that appellate court misapplied "clearly erroneous" standard of review when it substituted its judgment for trial court's in deciding that prosecutor's facially race-neutral reason for striking veniremember was pretext). Rather than accepting the trial court's finding that the prosecutor's reasons for striking Fortune were valid and race-neutral, and rather than requiring that the defendant rebut the presumption of correctness by clear and convincing evidence, the majority indulges its own presumption of *incorrectness*, essentially dismissing the prosecutor's explanation for striking Fortune out of hand. And, rather than allowing the trial court to make the factual determination as to whether the prosecutor's stated reasons for the strike were a "pretext," the majority ignores the express finding of the trial court that the prosecutor's reasons for the strike were racially neutral. Instead, it determines for itself, based on its own evaluation of the prosecutor's and Fortune's credibility from its review of the evidence, that the prosecutor's peremptory strike of Fortune was motivated by racial discrimination.

The majority treats the prosecutor's stated reasons for striking Fortune with incredulity throughout its opinion, in direct opposition to the mandate of *Watkins* that it "should examine a trial court's conclusion that a facially race-neutral explanation for a peremptory challenge is genuine, rather than a pretext, with great

6

deference." *Watkins*, 245 S.W.3d at 448. It characterizes the prosecutor's "stated reasons" for striking Fortune with caveats and quotation marks:

> his alleged belief that the jury on which Fortune had previously served had not reached a verdict and her statement that the jury did not assess punishment; Fortune's "tone" and referral to the defendant in the prior case as the "accused"; and her overall bad "vibe," eye contract, and demeanor with the prosecutor in contrast to her attentiveness to appellant's counsel (including the alleged incident in which she "point[ed]" out to the prosecutor that he was wanted at the bench).

Slip Op. at 8. It then declares, "There is no factual basis in the record to support the State's argument that the jury on which Fortune had previously served did not reach a verdict." Slip Op. at 8.

The majority's characterization of the prosecutor's testimony and its implied conclusion that that testimony is not based on fact can only have been intended to support the majority's substitution of its own evaluation of the credibility of the prosecutor for that of the trial court, in contradiction of the standard of review. *See Gibson*, 144 S.W.3d at 534; *see also Snyder*, 552 U.S. at 477, 128 S. Ct. at 1208 (stating that step three requires evaluation of prosecutor's credibility, of which best evidence is often demeanor of prosecutor, as well as venire member's demeanor, "making the trial court's first-hand observations of even greater importance"). The majority then reasons, "The prosecutor asked essentially identical questions of [white] venire members 7 and 8 regarding whether they had assessed punishment during their prior jury service," and, "[d]espite their nearly identical answers to the

7

prosecutor's question," seated them on the jury. The majority concludes that "the State's purported race-neutral explanation, which changed during the *Batson* hearing and ultimately is not supported by the record, for striking Fortune based upon her prior jury service, was not genuine and was pretextual" and, therefore, "naturally gives rise to an inference of discriminatory intent." Slip Op. at 9 (quoting *Snyder*, 552 U.S. at 485, 128 S. Ct. at 1212). It then simply dismisses the reasons relating to Fortune's demeanor that the State actually gave for striking Fortune, including, as the majority puts it, "her purported bad 'vibe,' i.e., the tone of her voice, lack of eye contact with the trial prosecutor, and her contrasting attentiveness to appellant's counsel." Slip Op. at 9.

In substituting itself as fact-finder for the *Batson* inquiry, the majority completely ignores the purpose of the exchange between the prosecutor and the trial court at the *Batson* hearing, during which the trial court evaluated the prosecutor's demeanor and credibility. When asked for his race-neutral reasons for striking Fortune, the prosecutor referenced the aspects of Fortune's demeanor the majority sets out and then stated,

> For example, before we started jury selection when [appellant's counsel] wanted me to approach the bench, [Fortune] was paying attention to him the whole time and then actually pointed me out to tell me that he wanted me. That of and in itself isn't that big of a deal but then coupled when she was asked about her prior jury service, I was troubled because she was the only person who used the term that the defendant was accused of—I think burglary of habitation for stealing something and then we went to the part whether or not she

8

got a verdict or this as punishment she said they didn't. I just got the feeling—by the ways, she said the word accused that she felt like he was wrongfully. I got based on the tone she was the only person who described it as—everyone else when asked about it, they said it was a theft case or it was this case. So, that was what troubled me with regard to Juror No. 6. . . . [Y]ou can see, I placed Juror No. 24 on the panel. There [are] other people I struck for similar reasons.

The court then asked who the other jurors were whom he struck "for similar reasons," and the prosecutor responded with references to jurors number one (a white male), eleven (an African-American female), twelve (a white female), thirty-three (a white male), and forty-two (a white male), referencing the similarities in their demeanor to that of Fortune.

After the prosecutor explained his reasons for the strike, the trial court recognized appellant's counsel for rebuttal. Appellant's counsel returned to the prosecutor's statement that he was troubled by Fortune's calling the defendant in the prior case in which she served as a juror "the accused," and he reminded the court that everyone is innocent until proved guilty. The trial court then questioned the prosecutor more closely about the defense's objection to the strike, and the prosecutor emphasized in his answer that it was not just the fact that the jury had not assessed punishment that caused him to strike Fortune, but "the way she phrased it" and "the tone of voice she said it, the way the eye contact that I was not getting with her, the eye contact [defense counsel] was getting with her, the way she said I felt like she insinuations in my mind was that the I was wrongfully

9

accused *[sic]*."  Also, she had been "watching [defense counsel] just more which is [a] concern of mine," and she had pointed to the prosecutor to approach the bench when he was not paying attention, "saying that [defense counsel] wanted me.  So, you know, I put those things together; and I just —that's where I come up with my concerns."

After listening to the prosecutor's explanation, the trial court—an experienced and highly respected African-American female criminal district court judge—immediately found on the record "that the State has offered race neutral reasons for exercising their strikes [on] Venireman No. 6 [Fortune] and No. 11," and she denied the defense's *Batson* motion.  The majority states, however, that "[t]he trial court then denied appellant's *Batson* challenge without explanation," and "the trial court did not make a finding that the State had credibly relied on Fortune's demeanor or her bad 'vibe' in exercising the peremptory challenge against her."  Slip Op. at 6.  In fact, the trial court did expressly find on the record that the State had "offered race neutral reasons" for exercising a peremptory strike on Fortune.

Having made the incorrect statement that the trial court denied appellant's *Batson* challenge without explanation, the majority continues its substitution of itself for the trial court in the *Batson* inquiry, stating in the next sentence, "In fact, the record reveals that the trial court, based upon Fortune's prior jury service,

10

actually engaged her in questioning to illustrate legal concepts to the venire panel." It concludes, "This counters any suggestion that the trial court would have credited the State's explanation that Fortune was inattentive or was sending a bad 'vibe' in the courtroom." Slip Op. at 11–12.

Both the majority's statement that the trial court did not make a finding on Fortune's credibility and its statement that the trial court "actually" engaged Fortune "to illustrate legal concepts to the venire panel" serve only to justify its own evaluation of the prosecutor's credibility and its complete lack of deference to the trial court's evaluation and ruling by showing what the trial court "really" thought about Fortune, and thus to justify its rejection of the trial court's finding that the prosecutor's reasons for striking Fortune were race neutral. In short, the majority imagines a plausible reason for the trial court to have ruled other than it did on the defendant's *Batson* challenge, in contradiction of the standard set out in *Miller-El*, *Gibson*, and *Watkins*, which forbids the reviewing court from substituting itself for the trial court in the third step of the *Batson* inquiry. *See Miller-El*, 545 U.S. at 252, 125 S. Ct. at 2332; *Watkins*, 245 S.W.3d at 449 n.19; *Gibson*, 144 S.W.3d at 534.

Moreover, the majority bases its imagined reason for reaching a ruling contrary to the ruling of the trial court on a misleading representation of the record. The trial court did not engage Fortune "to illustrate legal concepts" to the venire in

11

order to show its approbation of her as a potential juror capable of instructing the others, as the majority implies. Instead, the trial court conducted the initial voir dire before turning it over to counsel for the parties. In that period, at the beginning of voir dire, the court posed a hypothetical situation to the venire in which she asked the venire members to suppose that "[t]he State called 50 witnesses. The other side had a chance to ask questions and didn't do so. So, everything those 50 people had to say must be the truth. I am going to find this guy guilty in no time flat and be on my way home." The court then asked, "Ms. Fortune, since you've been on a jury before, do you think that's the right approach the jury should take in that circumstance?" When Fortune replied, "No, Your Honor," the court asked, "Why?" Upon receiving the answer, "Because the evidence has to prove beyond a reasonable doubt," the court probed further and then asked another juror, "What do you think about that?" Getting the answer, "I agree," the court asked that juror further questions and then thanked both and explained the jury's function to the venire. It is extremely misleading to imply, as the majority does, that the trial court, having heard Fortune's answer to the prosecution's questions about her jury service during voir dire, *then* turned to Fortune with approbation of her legal knowledge and experience as a juror as illustrative of proper juror behavior for the other venire members.

12

Unlike the majority, I do not conclude that Fortune's answers to questions about what the State would have to prove for her to find the defendant guilty to be mere questioning to illustrate legal concepts. I take the trial court's questioning of Fortune to be its examination of her to determine what jurors who had previously served thought the role of a juror was. That questioning offered the trial court the opportunity to hear Fortune's answers and to observe her demeanor in answering them, just as the rest of the voir dire offered the trial court the opportunity to witness all the potential jurors' answers and demeanor, along with that of counsel for both sides. Thus, the questioning, among other things, allowed the court to develop a basis for determining the constitutional validity of a peremptory strike, should a *Batson* challenge be made. Likewise, the *Batson* hearing itself offered the trial court the opportunity to evaluate the demeanor and credibility of the prosecutor and to determine whether his concerns about Fortune were valid or motivated by purposeful discrimination. *See Snyder*, 552 U.S. at 477, 484–85, 128 S. Ct. at 1208, 1212 (holding that question presented at third step of *Batson* inquiry is "whether the defendant has shown purposeful discrimination," and "best evidence" is often demeanor of attorney who exercised strike).

The fact that the trial court overruled the defendant's *Batson* challenge following questioning of the prosecutor in response to rebuttal argument by defense counsel indicates to me that the trial court satisfied herself that the State's

13

concerns about Fortune were justified in light of the court's own observations and the answers to her questions both before and during the *Batson* hearing. Because the State also struck other potential jurors, both black and white, male and female, for similar reasons and seated one of three available black jurors on the jury, and nothing indicates that the trial court was not in a position to evaluate the demeanor and credibility of both the prosecutor and Fortune, I would defer to the trial court's ruling. I see absolutely no "exceptional circumstances" that would justify overruling the trial court's determination regarding the propriety of the strike based on Fortune's demeanor in answering the State's questions during voir dire under the circumstances of this case. *See Snyder*, 552 U.S. at 477, 128 S. Ct. at 1208.

I would overrule appellant's third issue, urging his *Batson* challenge, and I would affirm the judgment of the trial court.


Evelyn V. Keyes
Justice

Panel consists of Justices Jennings, Keyes, and Higley.

Keyes, J., dissenting.

Publish. TEX. R. APP. P. 47.2(b).

14