**UNITED STATES Of America**

v.

**Morgan A. JOE, Sr., Alton L. Skeeter, and James E. Baylor, Jr.**

**Crim. No. 89–67–N.**

United States District Court,
E.D. Virginia,
Norfolk Division.

March 12, 1992.

James A. Metcalfe, Robert W. Wiechering, Paul G. Cassell, Asst. U.S. Attys., Norfolk, Va., Patrick C. Hogeboom, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., for U.S.

Wayne Lustig, Robert D. Seabolt, Mays and Valentine, Norfolk, Va., for defendant Joe.

Thomas B. Shuttleworth, Shuttleworth, Ruloff, Giordano & Kahle, Virginia Beach, Va., for defendant Skeeter.

Frederick T. Stant, Stephen C. Swain, Clark & Stant, P.C., Virginia Beach, Va., for defendant Baylor.

## MEMORANDUM AND ORDER

WALTER E. HOFFMAN, Senior District Judge.

*Procedural History of the Case*

The defendants in this case, Morgan A. Joe, Sr., ("Joe"), Alton L. Skeeter ("Skeet-er") and James E. Baylor, Jr. ("Baylor"), were tried by jury beginning October 30, 1989, and were convicted of numerous counts stemming from their participation in a kickback scheme involving United States Navy contracts on December 20, 1989.[1] Raising numerous issues, many of which were deemed to be "frivolous" by the Fourth Circuit, all of the defendants appealed their convictions. *See United States v. Joe,* 928 F.2d 99 (4th Cir.1991).[2] The cases of Joe and Skeeter were remanded to this court "to conduct a *Batson*[3] violation analysis." *Id.* at 104.

The initial *Batson* motion in this case was made by counsel for Joe and joined in by counsel for Skeeter after the petit jury was sworn on October 30, 1989. At that time, the court ordered the Assistant United States Attorney prosecuting the case, James A. Metcalfe ("Metcalfe"), to dictate to a court reporter the following morning, *in camera,* the reasons that he struck each particular black juror. This procedure was followed, the prosecutor's statement was sealed and a trial was conducted which resulted in each defendant's conviction.

The defendants renewed their *Batson* motion in post-trial proceedings. At a hearing on January 17, 1990, the court unsealed the prosecutor's statement explaining the reasons why he struck each particular black juror and turned it over to defense counsel.[4] At that time (and on the following day), defendants strenuously argued the *Batson* issue in a "quasi-evidentiary hearing" (Tr. Vol. 52, Supp. # 1, p. 16)

---

1. Defendants Joe and Skeeter, who are black, were employed as officers of Systems Management America Corporation ("SMA"); defendant Baylor, who is white, was an officer of the Baylor Corporation, a subcontractor that transacted business with SMA. Since the decision of the *Batson* issue now before the court does not turn on the plethora of charges on which these defendants were convicted, the court will not enumerate these charges in detail.

2. In *Joe,* the Fourth Circuit affirmed the conviction of Baylor. The Supreme Court of the United States denied Baylor's petition for a *writ of certiorari. Baylor v. United States,* — U.S. —, 112 S.Ct. 71, 116 L.Ed.2d 45 (1991). Baylor is not, therefore, a party to the present proceedings.

3. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (The government cannot exercise its peremptory challenges in a racially discriminatory manner.).

4. Due to Skeeter's illness, his argument on the *Batson* issue was postponed to March 1, 1990. At that time, however, counsel for Skeeter acknowledged that the hearings on January 17 and 18, 1990 were "my *Batson* hearing" and adopted on behalf of his client the arguments presented on Joe's behalf on January 18, 1990. (Transcript ("Tr.") Vol. 52 Supp. # 1 p. 16.). All references to the "Transcript" refer to their Fourth Circuit Volume numbers.

which all parties acknowledge to be a *"Batson* hearing."[5] At the conclusion of this *"Batson* hearing" (Tr. Vol. 55, p. 27), the following exchange took place between Joe's counsel and the court:

> MR. SEABOLT: Your Honor, if I may, just so the record is clear—and maybe the Court was about to do this—I think for the record purposes we ought to have a ruling on a factual level as to whether the government's reasons are sufficient under *Batson.*
>
> THE COURT: I'm going to give you a ruling. I've already ruled yesterday, and I will now reiterate my ruling, that I think your position is frivolous. . . . [6]

Along with other issues, this court's flat denial of defendants' *Batson* motion as "frivolous" was subsequently appealed to the Fourth Circuit.

In an opinion reported at 928 F.2d 99, the Fourth Circuit concluded that, "[T]he district court failed to make the factual determinations necessary for this court to review the *Batson* issue. . . ." *Id.* at 101.[7] In so concluding, the Fourth Circuit established the heretofore non-existent require-

ment that when ruling on the issues of whether the reasons presented by the government are facially neutral and, if so, whether the defendant can establish that such reasons are a pretext for discrimination, the district court should ". . . issue a specific ruling on each juror in question supported by its findings of fact and its rationale for the ruling." *Id.* at 103.

On remand, this court held a second *Batson* hearing.[8] At this hearing, Assistant United States Attorney Metcalfe testified at length and was subject to vigorous cross-examination regarding the prosecution's reasons for each of its peremptory strikes. In addition, before and after the hearing, both sides filed extensive memoranda in support of their various contentions.[9]

*Findings of Fact and Conclusions of Law*

■ In *Batson,* the Supreme Court held that the exercise of peremptory challenges by the government in a racially discriminatory manner violates a defendant's right to equal protection. A defendant establishes a *prima facie* case of discrimination by showing facts and circumstances that

---

**5.** Counsel for Joe made the following statement at the January 18, 1990 hearing:

> MR. SEABOLT: . . . Your Honor, I appreciate the Court giving me the opportunity to make these comments, and, as the Court said yesterday, this is our hearing, *Batson* hearing, and it's precisely what I asked for, an opportunity to address the Court on the reasons in the notes they dictated to the court reporter on the morning following jury selection.
>
> (Tr. Vol. 55, p. 5); *infra,* note 4.

**6.** At Skeeter's sentencing on March 1, 1990, his counsel acknowledged the Court's prior ruling on the *Batson* issue:

> MR. SHUTTLEWORTH: . . . I understand Your Honor's feelings about the particular *Batson* motion in this case.
>
> (Tr. Vol. 52, Supp. # 1, p. 14).

**7.** The entire record of this case was submitted to the Court of Appeals. A subsequent (12/4/91) amendment to the Fourth Circuit's Local Rules (which states that the record shall not be submitted to the Court of Appeals unless specifically requested by a judge of the Court, *See* Local Rule 10), confirms this court's fear that the submission of the record in this case was basically useless. At least by adopting this Rule, the Court of Appeals abandons all pretenses of examining the records of any given case.

**8.** Today, more than ever, the sentiments expressed by Chief Justice Burger in his dissent in *Batson* ring true in this court:

> The Court does not tarry long over any of these difficult, sensitive problems, preferring instead to gloss over them as swiftly as it slides over centuries of history: "[W]e make no attempt to instruct [trial] courts how best to implement our holding today." That leaves roughly 7,000 general jurisdiction state trial judges and approximately 500 federal trial judges at large to find their way through the morass the Court creates today. The Court essentially wishes these judges well as they begin the difficult enterprise of sorting out the implications of the Court's newly created "right." I join my colleagues in wishing the Nation's judges well as they struggle to grasp how to implement today's holding. To my mind, however, attention to these "implementation" questions leads quickly to the conclusion that there is no "good" way to implement the holding, let alone a "best" way.

> *Batson,* 476 U.S. at 131, 106 S.Ct. at 1741 (Burger, C.J., dissenting).

**9.** In considering this matter on remand, the court has taken into account the testimony and arguments made in connection with *both Batson* hearings in this case.

"raise an inference" that the peremptory strikes were used for the purpose of ex-cluding jurors on account of their race. *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723. If a defendant establishes a *prima facie* case of discrimination, the burden shifts to the government to produce a racially neu-tral explanation for the use of its strikes. *Id.* at 97, 106 S.Ct. at 1723. To meet this burden of production, the explanation must relate to the particular case to be tried. *Id.* at 98, 106 S.Ct. at 1724. "Unless a discrim-inatory intent is inherent in the prosecu-tor's explanation, the reason offered will be deemed race-neutral." *Hernandez v. New York*, — U.S. —, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) (Prosecutor's use of strikes against Spanish speaking prospec-tive jurors because they might not accept the translation of Spanish testimony was race-neutral.). Finally, if the government explanations are facially neutral, a defen-dant may nevertheless show purposeful discrimination by proving the explanations to be pretextual. *Id.*, 476 U.S. at 98, 106 S.Ct. at 1724; *see also, Joe*, 928 F.2d at 102. Of course, at all times, the defendant bears the ultimate burden of persuasion to prove the existence of "discriminatory pur-pose." *Hernandez*, 111 S.Ct. at 1866; *Bat-son*, 476 U.S. at 93, 106 S.Ct. at 1721. "Discriminatory purpose implies more than intent as volition or intent as awareness of consequences. It implies that the decision-maker selected a particular course of ac-tion, at least in part, 'because of,' not 'merely in spite of,' its adverse affects upon an identifiable group." *Hernandez*, 111 S.Ct. at 1866 (cites omitted).

In the present case, there has never been an express ruling that the defendants made out a *prima facie* case of discrimination. Nevertheless, the prosecution has articu-lated its reasons for exercising the strikes in question. This situation closely resem-bles that presented to the Supreme Court in *Hernandez*.

In *Hernandez*, a case decided two weeks after the second *Batson* hearing in this case, the prosecutor defended his use of peremptory strikes without any prompting or inquiry from the trial court. As a result the trial court never issued a ruling on whether the defendant had made a *prima facie* case of discrimination. In deciding that this departure from the normal course of *Batson* challenges was of no conse-quence, the Court analogized the *Batson* situation to the employment discrimination context, stating that "[w]here the defen-dant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer rele-vant." *Hernandez*, 111 S.Ct. at 1866, quot-ing *U.S. Postal Service Bd. of Govs. v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). The issue of whether the defendant in *Hernandez* had made out a *prima facie* case was, there-fore, deemed to be moot. In the present case, then, the preliminary issue of wheth-er defendants have made a *prima facie* showing of discrimination is moot since the prosecution has offered its reasons for its peremptory strikes.

In light of the posture of this case, the remainder of this opinion will be devoted to a juror-by-juror determination of whether the reasons presented by the government are facially neutral, and, if so, whether the defendants have established that such rea-sons are a pretext for discrimination.

*Juror-by-Juror Analysis*

■ 1) *John E. Hill* (black). Prospec-tive juror John E. Hill was the govern-ment's first peremptory strike. In his *in camera* proffer of October 31, 1989 ("prof-fer"), Metcalfe stated that Mr. Hill was struck because he seemed very eager to take part in the case, he "looked somewhat insolent" when he looked at the govern-ment and his daughter was an employee of SMA. (Tr. Vol. 14, pp. 10–11). The government, in fact, tried to have Mr. Hill struck for cause because of his daughter's affiliation with SMA. (Tr. Vol. 12, pp. 203–204).

At the second *Batson* hearing on May 16, 1991 ("hearing"), Metcalfe reiterated the concerns he expressed in the proffer. In addition, Metcalfe stated that Mr. Hill's employment at the Norfolk Navy Supply Center caused the government to look un-

favorably upon Mr. Hill as a juror (Tr. 5/16/91, pp. 50–51); (*see, infra,* p. 555, for discussion of criminal activity at Navy Supply Center).

The court finds that there is no discriminatory intent inherent in the explanations tendered by the government. People of all races are capable of overeagerness in their endeavors and all possess the ability to cast insolent looks about. The fact that one's child is employed by a company with a great deal to lose in the forthcoming prosecution is not a racially based factor; nor is the juror's work affiliation with an organization involved in an ongoing criminal investigation such a factor. The above reasons, are, then, facially neutral. In light of this finding, it is up to the defendant to prove that these reasons are a pretext for discrimination. This burden is not met in the case of Mr. Hill.

Metcalfe's testimony concerning Mr. Hill's strike was quite consistent and entirely credible. While defendants make much of Metcalfe's failure to, in the proffer, articulate the fact that Hill's employment at the Norfolk Navy Supply Center weighed in the decision to strike, this omission is quite understandable. The night before the proffer, the government had attempted to strike Mr. Hill for cause. The sole reason given by the government for "cause" was that Mr. Hill's daughter worked for SMA. (Tr. Vol. 12, p. 204). This attempt to strike, which occurred late in the day, was bound to be in the forefront of Metcalfe's mind when, the next morning, he gave his reasons for peremptorily striking Mr. Hill. Thus, the government's stated concern with Mr. Hill as a juror was because of his manner and affiliations (particularly the connection to SMA and his employment at the Navy Supply Center); these reasons were not discriminatory, and therefore, not a pretext.

■ 2) *Thermon Lawrence* (black). Prospective juror Thermon Lawrence was the government's second peremptory strike. In his proffer, Metcalfe stated that Mr. Lawrence was struck because he worked for a cleaning contractor on the Navy base and cleaning contractors are known to be involved in substantial fraud. In addition, the government was concerned by Mr. Lawrence's Suffolk residence for two reasons: (i) the length of the trial (and the effect of the commute on the 71–year-old Lawrence); and (ii) defendant Skeeter was from Suffolk. (Tr. Vol. 14, p. 12).

At the hearing, Metcalfe reiterated the concerns expressed in the proffer and added that Mr. Lawrence's indication of prior felony charges was also considered in deciding to strike him. (Tr. 5/16/92, pp. 27–28, 54–56).

No discriminatory intent is inherent in the explanations tendered by the government. Metcalfe's knowledge of fraud in the cleaning contractor industry stemmed from his knowledge of ongoing investigations of this area; there is no evidence that such contractors are somehow identified with one race or another. Nor can the fact of Mr. Lawrence's age (71) or residence (Suffolk) be considered to be race based factors. Finally, the fact that prior felony charges had been filed against Mr. Lawrence is not a race-based factor; such charges can and are filed every day against people of all races. The above reasons are, then, facially neutral. It is now the burden of defendants to prove that these reasons are a pretext for discrimination. This burden is not met in the case of Mr. Lawrence.

■ In their attempt to demonstrate pretext, defendants use a "divide and conquer" strategy. That is, instead of examining all of Mr. Lawrence's characteristics together, defendants take each individual characteristic cited by the government as figuring into their strike and examine it as if it was the sole reason for the government's strike. Defendants cite no authority in favor of this approach; *United States v. Lane,* [10] on the other hand, strongly suggests that such an approach is inappropriate: "*Numerous factors* may influence the decision of a prosecutor...." *Id.* at 106 (emphasis added). Moreover, it is apparent from an examination of Metcalfe's testimony at both the proffer and the hearing,

**10.** 866 F.2d 103 (4th Cir.1989).

which this court finds to be credible, that when deciding who to strike, the government examined a number of factors and looked at the "whole picture" when making a final decision. There is simply no evidence that Mr. Lawrence was struck because he was black. The court, therefore, rejects defendants' attempts to establish pretext by examining single characteristics as the sole reason behind a strike and concludes, therefore, that defendants have failed to establish that the reasons offered by the government were a pretext for discrimination.

3) *George Bell* (white). Prospective juror George Bell was the government's third peremptory strike. In his proffer, Metcalfe stated that Mr. Bell was struck because of his ties with Herman Valentine (President of SMA) and his admitted bias where Mr. Valentine was concerned. (Tr. Vol. 14, pp. 7–8). The government, in fact, attempted to have Mr. Bell struck for cause because of his ties to Mr. Valentine. (Tr. Vol. 12, pp. 186–192).

Defendants contend that the fact that the government struck a white juror like Bell is of little significance because it was "compelled" by the fact that the government's challenge for cause was unsuccessful. This argument misses the significance of Mr. Bell's strike. By striking Mr. Bell after challenging him for cause based upon his ties with SMA, the government treated Mr. Bell exactly as it treated another prospective juror unsuccessfully challenged for cause on the basis of ties with SMA, Mr. Hill. *See, supra*, p. 552. In this light, the government's consistency in striking both white and black jurors with ties to SMA can only lend further credibility to the government's explanations for its peremptory strikes.

4) *Gus Jackson* (black). Prospective juror Gus Jackson was the government's fourth peremptory strike. In his proffer, Metcalfe stated that Mr. Jackson

was struck because he works in the supply department at the Naval Air Station, Oceana, where the United States Attorney's Office had ongoing active investigations, he looked "somewhat angry" when looking at the government, he was working two jobs and he attended Norfolk State University, an institution which is closely associated with defendant Skeeter and Herman Valentine. (Tr. Vol. 14, p. 11).

At the hearing, Metcalfe reiterated the reasons given in the proffer for the government's strikes and went on to explain his rationale for the Norfolk State/SMA connection. After informing the court that one of the government's investigators gave him the information about Mr. Jackson attending Norfolk State, Metcalfe explained that it wasn't the fact that any of the defendants had merely attended the school, it was the fact that Herman Valentine and SMA were "identified" with Norfolk State. (Tr. 5/16/91, pp. 31–32).

The court finds that there is no discriminatory intent inherent in any of the reasons offered by the government. The ongoing investigation of the supply department at Oceana would cut against all employees in that department, not just employees of one race or another. Angry looks, while often in the eye of the beholder, can be given by a person of any race. (Tr. 5/16/91, p. 31).[11] Any person, not just a person of color, is burdened by having to work at two jobs. And, finally, while it is true that Norfolk State is a predominantly black institution, it is the fact of identification with any institution also identified with SMA which the government expressed a problem with, not the fact that Norfolk State was a predominantly black institution. The government's reasons are, then, facially neutral. The defendants must prove that these reasons are a pretext for discrimination. The defendants do not make such a showing in Mr. Jackson's case.

11. THE COURT: How does a person look angry?
MR. METCALFE: Well, if they look at you—I don't know how to describe it. If they look at you and they frown or look at you and look away as if they don't want to look at you, that would to me be the sort of indication that someone is put off by you.
THE COURT: Well, if you apply that to me, I guess I look angry at you all the time; don't I?
MR. METCALFE: There have certainly been times when you've looked angry at me, judge.

Metcalfe's testimony concerning Mr. Jackson's strike was consistent and entirely credible. Defendants again attempt to employ their "divide and conquer" strategy by isolating each reason given by the government from every other reason given. Even this strategy, however, does not cast doubt on the government's motives for striking Mr. Jackson. Considering the investigations in the supply department at Oceana, Mr. Jackson's place of employment, it was quite prudent of the United States to not risk encountering a potential conflict situation. While this, by itself, may have been a good enough reason to strike Mr. Jackson, when the totality of the situation is considered (in court demeanor, economic plight and attendance at Norfolk State), the government's strike of Mr. Jackson is quite justifiable. There is simply no evidence that Mr. Jackson was struck because he was black. These reasons are not, therefore, a pretext for discrimination.

5) *Pamela Elliott* (black). Prospective juror Pamela Elliott was the government's fifth peremptory strike. In his proffer, Metcalfe stated that Ms. Elliott was struck because she was from Portsmouth, the home of defendant Joe, and also because she worked for American Speedy Printing in 1987 and 1988, a company which had accounts with SMA.

At the hearing, Metcalfe reiterated the above concerns. In addition, he stated that Ms. Elliott's young age (22) was a "negative" and that he was "concerned" that she had not disclosed her connection with SMA when Mr. Hill divulged his connection with SMA. (Tr. 5/16/91, pp. 33–34).

No discriminatory intent is inherent in the explanation tendered by the government. People of all races live in Portsmouth. In addition, as previously demonstrated, both blacks and whites are connected with SMA. Age, on its face, cannot be considered to be a race based factor. Finally, the *timing* of Ms. Elliott's disclosure is not and cannot be race dependent; any person can choose when to hold back and when to come forward with information. The government's reasons are, therefore, facially neutral. The defendants

must now prove that these reasons are a pretext for discrimination.

Here, again, defendants base their attack on the notion that each reason given by the government should be considered independently of every other reason given. As stated *supra* at p. 552, this method is simply incorrect. If either the fact that Ms. Elliott was young or was from Portsmouth was the sole reason the government gave for striking her, and young whites or whites from Portsmouth were not struck, a finding of pretext might be possible; there is, however, much more to the consideration of Ms. Elliott (and to every potential juror) than one simple characteristic examined as it existed in a vacuum. In fact, in Ms. Elliott's case, the government credibly stated that it also considered her connection to SMA and the manner in which she divulged that connection. When the totality of Ms. Elliott and her situation is considered, there is no evidence she was struck because she was black. The government's reasons for striking Ms. Elliott were not a pretext for discrimination.

6) *Fannie Perry* (black). Prospective juror Fannie Perry was the government's sixth peremptory strike. In his proffer, Metcalfe stated that Ms. Perry was struck because she listed only an eleventh grade education, the government could not find a jury questionnaire on her, she was a single mother and she looked somewhat angry at the government side. (Tr. Vol. 14, pp. 12–13).

At the hearing, Metcalfe reiterated the concerns expressed in the proffer and added that her "youngish" age (26) and difficult economic circumstances also made the government look unfavorably upon her as a juror. (Tr. 5/16/91, pp. 35–36).

The court finds that there is no discriminatory intent inherent in any of the reasons tendered by the government. Education is not a factor which is race based by nature. The amount or type of education a person possesses depends upon many factors (attentiveness, interest, intelligence, experience and curriculum, to name a few); race is not among these factors. The fact that Ms. Perry is a single parent does not carry

any racial undertones; in light of today's high divorce rate, to name just one factor, single parents of all races exist in great numbers. Nor is the fact of difficult economic circumstances an inherently race based factor; such difficult circumstances plague persons of all races and are the result of a combination of factors (education, skills and motivation to name a few) in any given case. Finally, as stated previously, an "angry" look can be given by anyone; this is not a skill which is peculiar to one race or another. In light of this analysis, the reasons given by the government for striking Ms. Perry are race neutral. The defendants then, must prove that the reasons articulated by Metcalfe are a pretext for discrimination. This burden is not met in Ms. Perry's case.

Defendants attack Ms. Perry's strike on the basis that the government's use of education and her single parent status were a pretext for discrimination. Defendants wholly ignore the government's credible reliance on these factors as well as Ms. Perry's young age, apparent angry demeanor and difficult economic circumstances. Common sense tells this court that there is a high probability that a single mother with a low-paying job is not going to be kindly disposed to serving on a jury for six weeks at the rate of $30.00 per day. That such a juror might appear to be angry and would, in the end, hold the government responsible for her plight are both very real possibilities. *See United States v. Williams,* 934 F.2d 847, 850 (7th Cir.1991); *see also United States v. Lane,* 866 F.2d 103, 106 (4th Cir.1989). As far as Ms. Perry's educational background is concerned, the government has said that education was an important consideration because the trial involved fairly complicated racketeering and fraud issues. *See United States v. Welch,* 931 F.2d 55 (4th Cir.1991) (*per curiam*) ("A potential juror's lack of education and unemployed status may constitute sufficiently clear and legitimate reasons for a prosecutor to use a peremptory challenge to strike that juror."). While there were white jurors who had less formal education than Ms. Perry, these jurors were older and held jobs as skilled laborers. They

were not, to say the least, facing the same situation with respect to time and money faced by Ms. Perry. (Tr. 5/16/91, pp. 72–73). When her relatively unimpressive educational background is considered along with other attributes (young, single parent, hourly wage earner, financial difficulties), it is not the case that the reasons given for Ms. Perry's strike were a pretext for discrimination.

7) *Rosa Fitchett* (black). Prospective juror Rosa Fitchett was the government's alternate number one peremptory strike. In his proffer, Metcalfe stated that Ms. Fitchett was struck because of her employment at the Navy Supply Center in Norfolk during the time period when Joe Taliaferro was also employed there. Mr. Taliaferro was convicted for his part of a scheme involving defendant Joe in which Joe and Taliaferro rigged contract awards and arranged for friends of Joe to be given jobs at the Supply Center. In addition, Metcalfe stated that Ms. Fitchett wore exotic sunglasses while in court and appeared to be somewhat friendly in her glances toward the defendants. (Tr. Vol. 14, pp. 9–10).

At the hearing, Metcalfe simply reiterated the reasons given in the proffer for the government's strike. (Tr. 5/16/91, pp. 37–38).

There is no discriminatory intent inherent in either of the reasons offered by the government. The fact Ms. Fitchett was employed at the Navy Supply Center in Norfolk is not dependent upon her race (*see supra,* p. 551 for discussion of Mr. Hill's employment at Navy Supply Center). Ms. Fitchett's choice of exotic sunglasses is not a racially motivated reason. She was the only prospective juror who chose to wear her sunglasses while in the courtroom. There is (and can be) no suggestion that a single white juror wearing sunglasses would not have appeared equally peculiar. Finally, even though she was wearing sunglasses, it would be possible, by facial expressions and the like, to get some idea of Ms. Fitchett's general disposition towards the parties. As previously stated, the ability to look angry (or approvingly) is not

confined to any particular race. The above reasons are, then, facially neutral. Defendants must now prove that these reasons are a pretext for discrimination. This burden is not met in the case of Ms. Fitchett.

Metcalfe's testimony concerning Ms. Fitchett's strike was quite consistent and entirely credible. Considering defendant Joe's ties to the Navy Supply Center, it is almost absurd to even argue that, from the government's perspective, people employed there were qualified to sit on the jury in this case. As for Ms. Fitchett's appearance, the government was not the only one impressed by that fact.[12] While Ms. Fitchett's choice of exotic sunglasses alone would not disqualify her from service, when her apparent distaste for the government and, most importantly, her employment at the Navy Supply Center is considered, it is quite understandable why the government struck her; she was not, then, struck because she was black. The reasons given are not a pretext for discrimination.

8) *Renee Gore* (white). Prospective juror Renee Gore was the government's number two alternate peremptory strike. In his proffer, Metcalfe stated that she was struck because her husband or former husband was in government contracting. (Tr. Vol. 14, p. 10).

At the hearing in addition to reiterating the reason given above, Metcalfe stated that the government also considered Ms. Gore's employment at Southern Tile to be troublesome since Southern Tile may have done business with either defendant Baylor or some other organization charged as part of the crime in this case.

The sole argument of defendants with regard to Ms. Gore is that no significance should be attached to the fact that she was struck since she would have been the second alternate and would have a low likelihood of ever serving. This argument has no force and is severely undermined by two facts. First, if the government had wanted to exclude as many blacks from the panel as possible, it could have done so by striking Loretta Johnson, a black alternate. Second, as this case demonstrated when three of the four alternate jurors were called to serve, every peremptory strike "matters." In essence, the government's strike of Ms. Gore does nothing to bolster defendants' arguments that the government's peremptory strikes were racially motivated.

*Conclusion*

For the foregoing reasons, this court finds the facially neutral reasons offered by the government for each of its peremptory strikes to be: (i) clear and specific; (ii) trial related; and (iii) applied consistently to all prospective jurors, regardless of race; and, hereby, DENIES each defendant's motion for a new trial. *See Batson*, 476 U.S. at 98 n. 20, 106 S.Ct. at 1724 n. 20.[13]

Finally, racial discrimination in jury selection is intolerable; this case, however, represents all that can go wrong when *Batson* is applied in the district courts. As this court stated at the second *Batson* hearing held in this case: "Justice Powell, for whom I have the greatest amount of respect, when he wrote the opinion, said don't let, ever let a *Batsen* [sic] hearing get into a mini trial. You gentlemen are going to show how that is done." (Tr. 5/16/91, p. 90). *See also U.S. v. Tindle*, 860 F.2d 125, 131 (4th Cir.1988) (*Batson* does not require

---

**12.** THE COURT: I will agree with you (METCALFE) to this extent that she impressed me somewhat that way (unusual) by reason of those sunglasses. I think that's a terribly weak excuse as such, but I do remember something about the connection and Mr. Joe's proclivities along certain lines. (Tr. 5/16/91, p. 37).

**13.** In their attempts to establish pretext, defendants examine why certain jurors were not peremptorily struck from serving on the petit jury. *Batson* certainly never contemplated that prose-

cutors would have to explain why they did *not* strike someone. Similarly, defendants' use of statistics to bolster their position is unpersuasive. The government's juror rating system, as employed the night before trial, was not a precise, methodical rating system based upon fixed criteria. It was merely a quick means by which the prosecutors could record their general impressions of prospective jurors. Statistics based upon such a system are, at best, of questionable reliability and carry no force with the court.

a trial within a trial...."). And, indeed, the lawyers in this case have built up a voluminous record on the *Batson* issue which even includes an argument on the merits of "multiple regression analysis." [14] Voluminous records and arguments on "multiple regression analysis," to say the least, cannot be what the Supreme Court envisioned when, in *Batson,* it stated: "Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Id.,* 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21.

After a thorough re-examination of the record of this case,[15] the court is convinced, now more than ever, of two things: (i) that there is no merit to the *Batson* challenge in this case; and (ii) that *Batson,* as applied in this Circuit after *Joe,* places undue strain on judicial resources by requiring specific findings for each juror peremptorily struck.

The Clerk will forward copies of this memorandum and order to all counsel of record.

---

**14.** Testimony and argument on the *Batson* issue, in this court alone, covers approximately 250 pages of transcript and over 200 pages of written memoranda, excluding exhibits.

**15.** In reaching its decision, the court gave no weight to the facts that the defendants peremptorily struck twelve white jurors, that the original panel of jurors in this case consisted of six white jurors and six black jurors or that the panel of jurors who rendered the verdict in this case consisted of seven white jurors and five black jurors.