# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-00-00302-CR

**Bobby Coleman, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT
### NO. 0002115, HONORABLE CHARLES F. CAMPBELL, JR., JUDGE PRESIDING

A jury convicted Bobby Coleman of aggravated assault. The punishment was enhanced by a previous felony. The jury assessed thirty years in prison and a $10,000 fine. Appellant, an African-American, contends that the district court erred by rejecting his contention that the State's strike of the sole African-American member of the prospective juror panel was racially motivated. We will affirm the judgment.

The State cannot exercise its peremptory strikes of jury panelists in a purposefully and inappropriately discriminatory manner. Tex. Code Crim. Proc. Ann. art. 35.261 (West 1989); *Batson v. Kentucky*, 476 U.S. 79, 88-89 (1986). The analysis used to test a *Batson* challenge consists of three steps. First, the defendant must make a *prima facie* showing of relevant circumstances that raise an inference that the State made a race-based strike against an eligible panelist. *See Mandujano v. State*, 966 S.W.2d 816, 818 (Tex. App.—Austin 1998, pet. ref'd). Only minimal evidence is needed to support a rational inference; the burden is not

onerous.  *See id.*  Next, if a *prima facie* case is made, the State must come forward with a race-neutral reason for the strike.  *See id.*  The prosecutor's explanation must be clear and reasonably specific, and must contain legitimate reasons for the strike related to the case being tried.  *See id.*  Finally, once the State offers a race-neutral explanation, the burden shifts back to the defendant to persuade the trial court that the State's purported reasons for its peremptory strike are mere pretext and are in fact racially motivated.  *See id.*; *Lopez v. State*, 940 S.W.2d 388, 389-90 (Tex. App.–Austin 1997), *pet. ref'd*, 954 S.W.2d 774 (Tex. Crim. App. 1997) (McCormick, P.J., dissenting to refusal of State's petition); *see also Purkett v. Elem*, 514 U.S. 765, 767 (1995); *Hernandez v. New York*, 500 U.S. 352, 359-60 (1991).

We review the district court's decision for "clear error."  *Lopez*, 940 S.W.2d at 390 (citing *Hernandez*, 500 U.S. at 364-65).  We review all of the evidence in the light most favorable to the district court's ruling.  To conclude that the trial court's decision was clearly erroneous, we must have a "definite and firm conviction that a mistake has been committed."  *Vargas v. State*, 838 S.W.2d 552, 554 (Tex. Crim. App. 1992).  If we cannot say that the trial court's ruling was clearly erroneous, we must uphold the ruling even if we would have weighed the evidence differently as the trier of fact.  *Lopez*, 940 S.W.2d at 390 n.2.

Coleman undisputedly made a *prima facie* showing of discrimination in the State's peremptory strike of panelist Chris Washington.  Coleman asserts, without contradiction, that Washington was the only African-American panelist.  The State's peremptory strike of the only African-American panelist constitutes a *prima facie* case of discrimination based on race.  *See Salazar*, 795 S.W.2d at 193.

2

The prosecutor, Ms. Hohengarten offered the following race-neutral bases for the strike:

The state would respond with some additional information about Mr. Washington upon which it based in part its decision. That is that the criminal history that I was provided indicating a Chris Washington of the same date of birth and approximate height and weight was accused of injury to a child, a second degree felony. It indicates that this occurred in December of 1997 and that he was not formally charged.

So I did not believe that there was a basis for challenge for cause, however, being that this is a case involving bodily injury and that further Mr. Washington, when asked as a panel, did not volunteer that he had been accused of any offense and also did not check that box on his jury card, gave the prosecution concern about his forthcomingness and ability to be fair and impartial to the state.

Further, when asked a question regarding which theory of punishment he believed would be his proffered theory, he was unable to answer the question and stated that he did not understand the question.

Further, I do have an indication that he may have two warrants for his arrest, one for failure to maintain financial responsibility, which is usually failure to carry your liability card for auto insurance, and also a violation of a promise to appear and those dates the offense dates for both of those were June 5th of '97. And I have not been able to determine whether there is actually a warrant, but that is what the county's computer indicates.

The defendant responded as follows:

Your Honor, we would respond by urging the Court not to consider any of the alleged criminal history information offered by the state and purported justification for its exclusion of the prospective juror for the reason that he was never confronted with or given an opportunity to contest the validity of any such information, nor was the defense made aware of the existence of such information so that we could challenge it.

Therefore, especially given the historically recognized statistical significance of racially biased arrests on the part of the state historically that the use of this secret

3

information as a purported race neutral basis for exclusion is, in fact, a perpetuation of a policy of discrimination which works to the detriment both to this prospective juror and to the defendant.

In denying the *Batson* challenge, the district court stated:

The court finds that the juror never did answer the question that Ms. Hohengarten put to him, regardless of what his criminal history may be, never did answer the question put to him about rehabilitation, deterrence, and retribution as forms of punishment. He seemed either unwilling or unable to have even answered the question. In fact I think he may have been the only one on the entire panel that didn't answer the question.

Because the court based its decision on the punishment colloquy, we first will examine that basis for the strike.

The prosecutor asked the panel which purpose of punishment was the most important—rehabilitation, deterrence, or retribution. The first panelist responded, "Retribution." The second panelist, after having the choices repeated, responded, "The second one." With Washington, the third panelist, the following exchange occurred:

JUROR WASHINGTON: Could you clarify your question again?

MS. HOHENGARTEN: Well, I'm giving you kind of three overall reasons that we punish people for committing crimes, okay? And I want to know from you what you think is the best reason, the most important reason, perhaps the reason that you think is the most effective way to punish somebody.

JUROR WASHINGTON: It depends on the crime.

MS. HOHENGARTEN: Okay. So you might even say that it depended on their history, right?

JUROR WASHINGTON: Yes.

4

MS. HOHENGARTEN:  You might have a person who has no criminal history and you want them to be rehabilitated.  And you might have a person who has committed crimes and you are like just lock him up and throw away the key, right?  But I still want to ask you in your heart of hearts, without regard to the offense, which just strikes you as the most important.

JUROR WASHINGTON:  I don't understand why you say which one is the most important.

MS. HOHENGARTEN:  Well, some people believe you have heard the saying an eye for an eye, a tooth for a tooth, and they believe in certain countries you steal something, you have your arm cut off.  They say phooey on rehabilitation, phooey on deterrence.  So I just want to know where you are coming from.

JUROR WASHINGTON:  I just don't really understand your question.

MS. HOHENGARTEN:  Okay.  I'll let you off the hook, but I'm not going to let too many people off the hook, all right?

The next twenty-four panelists answered in fewer than seven words each—most with a single word.  The next panelist answered, "I find it hard, because I think you would have to suit it to the thing, but I would probably say deterrence."  The next nine panelists answered with one word.  Panelist Larry Thompson said, "I don't have one."  The final eleven panelists answered the question with one word.

Appellant argues that the court's finding that Washington was unable or unwilling to answer the question is not supported by the record.  He notes that Washington was a verbal and willing participant in an exchange with the prosecutor regarding the nature of the beyond-a-reasonable-doubt standard.  Coleman also notes that the prosecutor cut off the punishment discussion before Washington gave an answer.

5

The record is clear, however, that Washington had more discussion with the prosecutor on this question than all the other panelists combined and yet did not arrive at an answer. The record is also clear that, despite the prosecutor's attempts at reformulating the question, Washington said he did not understand the question. Perhaps, as Coleman posits and Washington's first response indicates, Washington did not believe there was a single answer for all situations. The fact remains that Washington had four responses and none of them was a direct answer, which contrasted sharply with the simple answers of the remaining panelists. There is no showing that the strike of Washington shows disparate treatment of less responsive panelists; Thompson, the only other panelist not to answer, was excused from the panel by the agreement of the parties based on an unspecified "litany of problems." Whether Washington's responses showed him thoughtful, confused, or stubborn, there is no showing that the prosecutor's discomfort with the colloquy had any basis in race whatsoever.

Because we have found a race-neutral reason for the strike, we need not find that the criminal-history basis was legitimate and proved; we must, however, determine whether this basis evidences a racial *animus* that renders the colloquy basis a mere pretext.

We conclude that the district court did not clearly err by implicitly concluding that the prosecutor's comments arising from Washington's alleged criminal history did not show that the colloquy basis was a pretext for racial discrimination. The prosecutor stated that she was provided with a criminal history indicating that a man of the same name, date of birth, and approximate height and weight as Washington was accused of injury to a child, but was never charged. The State expressed concern about Washington's potential fairness to the State because

6

(1) he had been accused of a crime with some similarities to the crime at issue, and (2) he had not acknowledged being accused of this crime either during voir dire or on his juror card; the State also expressed concern about outstanding warrants. These are legitimate concerns and do not show racial *animus*.[1] The debate over whether the State should have offered evidence of Washington's history, confronted Washington with it, or shown it to the defendant is moot because the race-neutral explanation arising from the colloquy has not been shown to be a pretext for racial discrimination.

The district court's rejection of the *Batson* challenge was not clearly erroneous. We overrule point one. We affirm the conviction and sentence.

_____

Lee Yeakel, Justice

Before Chief Justice Aboussie, Justices Yeakel and Patterson

Affirmed

Filed:   March 29,  2001

_____

[1] Coleman does not raise his district-court complaint that using criminal history shows a racial *animus* because African-Americans are arrested more. While, if true, the arrest rates might result in a disparate impact on African-American panelists, racial *animus* would be apparent only if African-Americans with criminal histories were treated differently from non-African-Americans with criminal histories. Coleman's district-court argument does not address the State's related concerns about Washington's failure to advise the court of the fact that he was previously accused of a crime.

7

Do Not Publish