DECISION.
{¶ 1} The defendant-appellant, Ivey Nixon, appeals from his convictions and 36-year sentence of imprisonment on one count of attempted aggravated murder, one count of aggravated robbery, and two counts of felonious assault. The charges stemmed from a savage beating inflicted upon the owner of a small delicatessen and carryout restaurant in Price Hill, Cincinnati, during a daylight robbery. The crimes were captured on film by four surveillance cameras positioned in the store. At trial, Nixon, who was arrested by the police while still in the store, relied upon the affirmative defense of insanity. A jury rejected the opinion of a defense expert, who testified that, at the time of the offenses, Nixon suffered from paranoid schizophrenia and auditory and visual hallucinations, and was therefore unable to comprehend the wrongfulness of his actions, in favor of the testimony of the state's expert that he suffered from bipolar disorder but was still capable of distinguishing between right and wrong.
 {¶ 2} In his first two assignments of error, Nixon contends that the trial court erred by (1) refusing to suppress his statements made to the police after he was arrested; and (2) accepting the prosecutor's reason for dismissing a prospective African-American juror when the reason was clearly erroneous. In his third and final assignment, he contends that he was denied the effective assistance of counsel by his trial attorney's failure to elicit further testimony concerning his impaired mental state.
 FACTS {¶ 3} Because Nixon does not contest his participation in the robbery and assault, it is not necessary to belabor the horrific facts. It suffices to say that Nixon entered Braun's Deli in broad daylight, went behind the counter without saying a word, punched the owner (Chom Bernard, a 57-year-old Asian-American woman who had immigrated to this country) in the face, knocking her to the ground, and then proceeded to throw things from the counter on top of her. Nixon then took $240 from the cash register, but instead of leaving, he put the money in his pockets and then started pulling items off the store shelves, in effect choosing to vandalize the store rather than to flee from it. Horribly, Nixon then went back around the counter, picked up a stick, and struck Bernard, who was still lying on the floor, over a hundred times. The beating did not stop until the police, responding to a security alarm, entered the store and arrested Nixon. The owner was taken to the hospital in critical condition and has, tragically, never fully recovered from her injuries.
 {¶ 4} Transported to the police station after his arrest, Nixon signed a written waiver of his Miranda rights. According to the officer who testified at the suppression hearing, David Feldhaus, Nixon listened to an oral recitation of his rights before he signed the form, and when asked if he understood them, he responded affirmatively. Feldhaus testified that at this point Nixon was no longer in an agitated state, but appeared, rather, to be "very calm." (Nixon's handcuffs, the officer testified, were removed during the interview.) Feldhaus testified that he then stated, "I need to talk to you about what happened [in the store]," and that Nixon then began freely telling him his version of the robbery. Nixon explained that he lived in the neighborhood and had hostility toward the owner of the store because of her refusal to allow him to buy items on credit. He also told Feldhaus that the robbery began following an argument over whether the owner had shortchanged him on an earlier purchase.[1]
 {¶ 5} At trial, Nixon presented the testimony of Dr. Melvyn Nizny, a psychiatrist board-certified in both general and forensic psychiatry. Dr. Nizny had reviewed written materials (including Nixon's written statement to the police) and interviewed Nixon (twice for a total of five hours), his mother, father, sister, brother, live-in girlfriend, and ex-wife. Additionally, Dr. Nizny had viewed the surveillance videotape of the robbery and assault. Dr. Nizny testified that Nixon had told him that he was a prophet of God, "the chosen one," a "man child of the revolution," and "the little horn, sprung up in the middle of the earth that would judge the nation with a rod of iron." Nixon had also told him that, on the morning of the incident, he had a visual hallucination of seeing the "biblical prophet Malachi on a baby bottle," telling him that he had something important to accomplish. Dr. Nizny testified that Nixon had disclaimed any intention to enter the store and to commit robbery. Nixon had reported to him that when he got to the store, he could see an image on the door of "a man in the middle with a rock sitting on his head and two women with veils on their heads, a guy at his feet with a cape like Robin Hood." Nixon had also told Dr. Nizny that he felt that he was getting messages from people on television and radio about how he should live his life, and that he, Nixon, would often have conversations with the television screen.
 {¶ 6} Dr. Nizny characterized Nixon's behavior on the videotape as "[p]sychotic, out of contact with reality." He concluded that Nixon was suffering from paranoid-type schizophrenia with associated delusions as well as auditory and visual hallucinations. He testified that Nixon appeared to have no remorse for his actions, and that they were part of his belief that he had to save the world and redress grievances that he felt African-Americans had suffered for thousands of years. According to Dr. Nizny, Nixon had taken cash out of the register because he considered it a tithe that he had inherited through Jesus Christ. He stated that Nixon had described himself as a king who had been held hostage since birth. In Dr. Nizny's view, because of his mental disease or defect Nixon did not appreciate, and could not have appreciated, the wrongfulness of his behavior at the time of the incident.
 {¶ 7} To rebut the opinion of Dr. Nizny, the state presented the testimony of Dr. William S. Walters, a psychologist with a doctorate degree and the assistant director of the Court Clinic, which he described as a "community-based forensic center." Dr. Walters had interviewed Nixon (once for a period of one and one-half hours), reviewed written records, and spoken with witnesses who were in the store at the time of the occurrence, the police officers involved, and Nixon's mother, father, brother, and live-in girlfriend. Dr. Walters had also considered the results of the Minnesota Multiphasic Personality Inventory (MMPI) that was administered to Nixon. He testified that Nixon's profile on the MMPI was "typically seen as a fake/bad profile," meaning that the psychopathology was exaggerated "to such a degree that it was not likely that it was legitimate." Dr. Walters stated that he had "struggled" with the issue of whether Nixon had a severe mental disease and finally "gave him the benefit of the doubt" and found that there was "some indication of a bipolar disorder." He also stated that he felt that Nixon had a narcissistic personality and problems with anger and rage.
 {¶ 8} Dr. Walters, who had earlier found Nixon competent to stand trial, stated that he felt Nixon had a "very good grasp of his legal situation" and was, basically, "quite knowledgeable," possessing the equivalent of a bachelor's degree in divinity. Significantly, he stated that Nixon had told him in an interview that he was enraged at Bernard and "felt that she had not treated him fairly." Walters testified that Nixon had further indicated to him, as he had done to the police, that he bore resentment toward the victim for her refusal to allow him to purchase items on credit, and that, on the day of the incident, he had gone into the store earlier, had been shortchanged on a transaction, and had then had inadequate attention paid to his complaint. According to Dr. Walters, Nixon had never told him that he was acting on instructions from God. Dr. Walters testified that, in his opinion, Nixon was fully cable of appreciating the wrongfulness of his behavior when he attacked Bernard.
 {¶ 9} On cross-examination, Dr. Walters conceded that he was uncertain whether Nixon was on psychotropic medication at the time he interviewed him. Furthermore, Dr. Walters acknowledged that the doctor who had first characterized Nixon as a malingerer later appeared to have changed his diagnosis when he prescribed a triple dosage of anti-psychotic medication. Dr. Walters conceded that in his written evaluation to the court he had stated that Nixon had manifested some delusional beliefs that were grandiose, paranoid, and religious in nature. He stated that he thought there was a "possibility" that Nixon had been delusional.
 MOTION TO SUPPRESS {¶ 10} In his second assignment of error, which we consider first, Nixon argues that the trial court erred in refusing to suppress his statements made to the police during the interview following his arrest. While he does not contest that he signed the written waiver of his Miranda rights, he argues that his mental state did not allow him to fully comprehend what rights that he was waiving. Although Nixon at trial did not contest his participation in the events, his statements afterward would arguably have been relevant and, depending on their lucidity, detrimental to his insanity defense, and their subsequent admission prejudicial.
 {¶ 11} The burden is on the state to demonstrate that a defendant has made a voluntary, knowing and intelligent waiver of his privilege to remain silent. State v. Kassow (1971), 28 Ohio St.2d 141, 277 N.E.2d 435. The United States Supreme Court has described the state's burden as "heavy." Miranda v. Arizona (1966), 384 U.S. 436, 475, 86 S.Ct. 1602. Generally, however, where a defendant's rights have been clearly explained to him and he demonstrates a willingness to speak, police officers are not required to probe his motives for relinquishing his rights. State v. Jones (1974), 37 Ohio St.2d 21, 26, 306 N.E.2d 409. But "when a defendant subsequently acts in such a way as to reasonably alert an interrogating officer that the warnings given have been misapprehended, the officer must, before any further questioning, insure that the defendant fully and correctly understands his Fifth Amendment rights." Id. at 26-27, 306 N.E.2d 409.
 {¶ 12} Nixon largely bases his argument that he did not understand the waiver upon the opinion of Dr. Nizny, who had concluded that he suffered from paranoid schizophrenia with auditory and visual hallucinations. Dr. Nizny, however, did not testify at the suppression hearing, but only at trial. Indeed, there was only one witness at the pretrial suppression hearing, and that was the state's witness, Officer David Feldhaus, who conducted the interrogation. As we have already noted, Feldhaus testified that Nixon was "very calm" and appeared to have fully understood the rights form when it was read to him, as well as the fact that he was foregoing those rights by signing the waiver form. Upon cross-examination, Feldhaus did concede that Nixon's statement did not completely square with the facts or the surveillance tape, but he concluded that any discrepancies were due to dissembling rather than to a mental impairment. Feldhaus stated that he felt the differences were "self-serving, giving [Nixon] some kind of justification for how he acted * * *." Asked about Nixon's statement that he was "a king," Feldhaus stated, "[M]y feeling on that is that he made that statement because he couldn't come up with any kind of answer to justify taking the money." Feldhaus did acknowledge that Nixon had also made references to "losing his mind" during his rampage at the store, but he stated that he felt this referred to an "anger problem" rather than to some form of cognitive disassociation.
 {¶ 13} As noted, Feldhaus's testimony was uncontradicted at the suppression hearing. Nixon did not present any witnesses, nor did he present any documents or materials concerning his mental state — and specifically his ability to have understood the rights that were read to him. Nixon, it should be pointed out, had already been found to be competent to stand trial. Having reviewed Feldhaus's testimony and the statements made by Nixon, we cannot say that the trial court erred when it concluded, at the end of the hearing, that the state had met its burden to show a "knowing, voluntary, and intelligent waiver."
 {¶ 14} At trial, Dr. Nizny testified that Nixon's paranoid schizophrenia had caused a period of disassociation during the period of the beating and robbery. He also testified that during a diagnostic interview Nixon had claimed that he could not remember signing the waiver form, and that he had recalled that he did not want to talk without a lawyer. Also, as part of his written report, Dr. Nizny was asked to respond to the question whether Nixon's mental state at the time of his confession made it impossible for him to have knowingly, intelligently, and voluntarily waived his Miranda rights. Dr. Nizny responded, "Although from my understanding by history and examination that Mr. Nixon was in the throngs [sic] of a schizophrenic induced delusional state at the time he rendered his alleged confession, with his description * * * totally at variance with what I observed on the surveillance video, I do not find that statements Mr. Nixon offered to the police officers were in any way coerced[,] rather that his delusional state was not understood by them."
 {¶ 15} Because Dr. Nizny's testimony and his written report were presented during trial but not at the suppression herring, Nixon's trial attorney would have had to renew his earlier motion to suppress in order to preserve the issue based on their content. Nixon's appellate counsel, however, has not directed our attention to anywhere in the record where this was done. Even if the motion to suppress had been renewed at trial, Dr. Nizny's testimony and report did not directly address Nixon's capacity for understanding the rights that were read to him. Dr. Nizny did not opine, for example, that the delusional state that he thought Nixon was in earlier at the store would have necessarily precluded him from calming down to the point where his normal intelligence would have allowed him to understand the rights he was waiving afterward. Dr. Nizny's opinion and report would also have had to be considered along with that of the other trial expert, Dr. Williams S. Walters. Dr. Walters testified for the state that Nixon suffered from bipolar disorder but was not disassociative. As the state points out, the jury clearly credited the opinion of Dr. Walters over that of Dr. Nizny. Given this difference of opinion among experts at trial, we still would not be able to conclude, even if Nixon had renewed his motion to suppress his post-arrest statements, that the court had any new evidence before it that would have required it to reverse its earlier conclusion that Nixon had validly waived his Miranda rights.
 {¶ 16} Nixon's second assignment of error is overruled.
 BATSON CHALLENGE {¶ 17} In his first assignment of error, Nixon argues that the trial court erred by accepting the prosecution's stated reason for challenging a prospective African-American juror (the same race as Nixon) following an objection under Batson v. Kentucky (1986), 456 U.S. U.S. 79, 106 S.Ct. 1712. Nixon objects to the "race-neutral" reason given by the prosecutor because, he argues, it was based upon a mischaracterization of the juror's responses to questioning during voir dire. The prosecution's explanation for the challenge was, "I don't believe [the juror] could be fair and impartial. [The juror] told us that his son had been convicted of several crimes charged by the Cincinnati police. He said at the time his son was arrested that the police left the car on the expressway and while it was on the expressway someone had busted in the windows, vandalized the car." The prosecutor then added, "He also testified on other matters that made me believe that he would not be fair and impartial in this case. And for these reasons I ask that he be excused."
 {¶ 18} As Nixon correctly points out, the prospective juror never stated that his son had been "convicted of several crimes charged by the Cincinnati police." The juror stated only that his son had been arrested, requiring that he leave his car on the roadway. When the juror went back to pick up the car for his son, he discovered a person inside who had broken the window to enter. The juror stated that he used his training in the martial arts to subdue the culprit until the police arrived, and that the culprit was later convicted after pleading guilty. Other than this, the juror testified that he knew "[q]uite a few" people in law enforcement, including a cousin who was a state trooper and another cousin who apparently was with the Cincinnati Police Department. He never stated that his son had been convicted of anything.
 {¶ 19} As Nixon concedes, the burden of production on the state in response to a Batson challenge is not a difficult one. The prosecution must merely come forward with a "race-neutral" explanation for the challenge. Batson, supra at 96-98, 106 S.Ct. 1712. The explanation need not be "persuasive, or even plausible." Purkett v. Elem (1995),514 U.S. 765, 767-768, 115 S.Ct. 1769. The challenge is defeated so long as discriminatory intent is not inherent in the explanation. Id. A reviewing court, passing upon the trial court's finding that discriminatory intent was not present, may only reverse when the finding is "clearly erroneous." Hernandez v. New York (1991), 500 U.S. 352, 369,111 S.Ct. 1859.
 {¶ 20} Nixon argues that because the prosecutor's misstatement of the prospective juror's comments was "clearly erroneous," this court should conclude that the state failed in its burden of production. But the question is not whether the prosecutor's explanation accurately summarized the juror's comments — clearly it did not — but whether the explanation was "race-neutral," in other words, not inherently discriminatory. Simply because the prosecutor did not pay close attention to the comments did not make the explanation by default discriminatory. As the prosecution points out, the focus of a reviewing court is with the genuineness of the "race-neutral" explanation, not necessarily its reasonableness. State v. Gatewood (Dec. 22, 2000), 1st Dist. No. C-000157. The ultimate question on review is whether it can be said with "a definite and firm conviction" that the trial court was wrong in concluding that the challenge to the juror was not racially motivated.
 {¶ 21} Given the contacts with the legal system described by the prospective juror, not all of them favorable (his son was, in fact, arrested, and his son's car vandalized as a consequence of the arrest), the trial court's acceptance of the prosecution's stated doubts with respect to the juror's impartiality was not, we hold, "clearly erroneous." Such contacts could have legitimately struck a cautionary note with the prosecution. At worst, the prosecutor can be said to have been a poor listener, but there is no basis to conclude that the challenge was racially motivated. Consequently, Nixon's first assignment of error is overruled.
 INEFFECTIVE ASSISTANCE OF COUNSEL {¶ 22} In his third and final assignment of error, Nixon argues that he was denied the effective assistance of counsel because his trial attorney "inexplicably failed to introduce key testimony that would have rebutted the prosecution's theory that [Nixon] was faking mental illness." Although his trial attorney did put his sister on the stand during the guilt phase, Nixon argues that because she had been living in Tennessee for the last several years, and therefore had only seen him intermittently, she lacked firsthand knowledge of his behavior to testify in "any meaningful way." Nixon maintains that a description of his mental problems, based on greater familiarity, could have been provided by his mother and father, whom his attorney later put on the stand during the sentencing, but not during the guilt, phase of the trial.
 {¶ 23} The state remonstrates that Nixon's attorney's decision not to call additional family members was "purely tactical" because they would have been subjected to cross-examination on his drug and alcohol abuse. We do not presume to know trial counsel's thinking. But, in order to demonstrate a constitutional violation, Nixon is required to show both that his attorney's performance fell below a "wide range of reasonable professional assistance," and that there exists a reasonable probability that his attorney's alleged errors of omission affected the outcome of the trial. Strickland v. Washington (1984), 466 U.S. 668, 686,104 S.Ct. 2052; State v. Bradley (1989), 42 Ohio St.3d 136, 141-143, 538 N.E.2d 373.
 {¶ 24} Here, we cannot say that there exists a reasonable probability that the additional testimony of Nixon's mother and father would have changed the jurors' minds regarding the sanity of their son during the episode in question. The jury had already been provided with a great deal of information regarding Nixon's mental state from the two experts who testified. Nixon's sister's testimony, though challenged, successfully established that the family had been concerned for his mental and emotional well-being for some time, and it is unclear to what extent the testimony of his mother and father was necessary to reinforce this fact. Essentially, this case boiled down to the jury choosing between the expertise of Dr. Nizny and Dr. Walters concerning Nixon's capability, on the day of the incident, to comprehend the wrongful nature of his conduct. Even if the jury believed that Nixon had been delusional in the past, there still remained the question of whether, on that particular day, he was motivated by a twisted delusional belief that he was doing God's work or merely settling a grudge with Bernard over her refusal to give him credit. His statements to the police, and then later to Dr. Walters, were certainly strong evidence that he had beaten Bernard senseless out of anger and resentment rather than a delusional belief that had made it impossible for him to distinguish between right and wrong.
 {¶ 25} Finally, we note our agreement with the state that it is a matter of speculation as to how effective the testimony of Nixon's mother and father would have been if they had been subjected to cross-examination. Nixon's mother, it should be pointed out, spoke only briefly during sentencing, primarily to offer her sympathy to the Bernard family. The statement of Nixon's father was eloquently given but was general in nature and did not offer details as to his son's mental state on the day in question. The decision not to put them on the stand and face cross-examination may have been a tactical one given, as the state points out, that they may have been questioned on their knowledge of Nixon's drug and alcohol abuse. Furthermore, it is significant that Dr. Nizny's report, which was admitted into evidence, contained an extensive summary of his interviews with both of Nixon's parents, as well as his sister, clearly establishing their earlier concerns for his mental health and his history of delusional religiosity.
 {¶ 26} In sum, we cannot say on this record that Nixon has demonstrated the requisite degree of probability that the outcome of the trial would have been different had his attorney chosen to put his mother and father on the witness stand during the guilt phase. Nixon's third assignment of error is, therefore, overruled. Accordingly, the judgment of the trial court is affirmed.
Judgment affirmed.
HILDEBRANDT, P.J., GORMAN and WINKLER, JJ.
[1] A transcript of the entire interview is part of the record.