OPINION
{¶ 1} On April 4, 2006, the Stark County Grand Jury indicted appellant, Randolph Young, on one count of felonious assault in violation of R.C. 2903.11, one count of domestic violence in violation of R.C. 2919.25, one count of having weapons while under disability in violation of R.C. 2923.13 and one count of tampering with evidence in violation of R.C. 2921.12. Said charges arose from an incident wherein appellant's live-in girlfriend, Ramona Young, was shot during a family cook-out on February 19, 2006. When Ms. Young called 911, she identified appellant as the shooter.
 {¶ 2} A jury trial commenced on May 11, 2006. The jury found appellant guilty as charged save for the tampering charge. By judgment entry filed May 23, 2006, the trial court sentenced appellant to an aggregate term of six years in prison.
 {¶ 3} Appellant filed an appeal and this matter is now before this court for consideration. Assignments of error are as follows:
 I {¶ 4} "THE TRIAL COURT ERRED IN PERMITTING THE STATE TO USE A PEREMPTORY CHALLENGE IN A RACIALLY DISCRIMINATORY FASHION."
 II {¶ 5} "THE TRIAL COURT ABUSED ITS DISCRETION IN ALLOWING THE STATE TO IMPEACH ITS OWN WITNESS." *Page 3 
 III {¶ 6} "THE TRIAL COURT'S FINDING OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE."
 I {¶ 7} Appellant claims the trial court erred in permitting the state to use a peremptory challenge to Juror No. 205 in violation ofBatson v. Kentucky (1986), 476 U.S. 79. We disagree.
 {¶ 8} A defendant in a criminal trial has the "right to be tried by a jury whose members are selected pursuant to non-discriminatory criteria." Batson v. Kentucky (1986), 476 U.S. 79, 85-86. The use of a peremptory challenge by a prosecutor is subject to analysis under the Equal Protection Clause. Id. In Hernandez v. New York (1991),500 U.S. 352, 358-359, the United States Supreme Court followed Batson, stating as follows:
 {¶ 9} "In Batson, we outlined a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause. * * * First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race.* * * Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. * * * Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination." (Citations omitted.) *Page 4 
 {¶ 10} Appellant and Juror No. 205 are both African-American. T. at 75. Appellant argues the state's reason for excluding Juror No. 205 was not race-neutral. During voir dire, Juror No. 205 stated a family member had been arrested for shoplifting and as a result, had to do community service and pay a fine. T. at 47. He admitted the result was equitable. Id. Juror No. 205 further acknowledged he had a problem with a ticket issued to him by a police officer, and he contested it. T. at 65. The police officer had taken the word of a neighbor over his. Id. Juror No. 205 acknowledged the experience would not affect how he would view the evidence "because you're the police, like you say, they human." T. at 66. He also questioned the meaning of "having a firearm under disability." T. at 68.
 {¶ 11} When questioned by the state about the jurors' familiarity with "Lady Justice," Juror No. 205 responded, "I guess you got scales saying the justice supposed to be even, and she has her eyes covered because it's supposed to be blind." T. at 44.
 {¶ 12} As noted by Justice Breyer in his concurrence in Rice v.Collins (2006), 546 U.S. 333, 126 S.Ct. 969, 977, a decision on excluding a juror via a peremptory challenge is multi-faceted. Factors include appearance, demeanor, context, and atmosphere:
 {¶ 13} "The trial judge is best placed to consider the factors that underlie credibility: demeanor, context, and atmosphere. And the trial judge is best placed to determine whether, in a borderline case, a prosecutor's hesitation or contradiction reflect (a) deception, or (b) the difficulty of providing a rational reason for an instinctive decision. Appellate judges cannot on the basis of a cold record easily second-guess a *Page 5 
trial judge's decision about likely motivation. These circumstances mean that appellate courts will, and must, grant the trial courts considerable leeway in applying Batson." Id.
 {¶ 14} As such, we acknowledge the trial court is best to judge whether a challenge is race-neutral or pretextual. In the case sub judice, the state could point to four incidents during the voir dire where the juror engaged in a dialogue with both the prosecutor and defense counsel. The answers were clearly not to any level of a challenge for cause, but could, to some, appear to indicate a bias or a questioning of the state's position.
 {¶ 15} We conclude the cited areas in the voir dire involving Juror No. 205 establish a race-neutral reason for excluding him.
 {¶ 16} Assignment of Error I is denied.
 II {¶ 17} Appellant claims the trial court erred in permitting the state to impeach its own witness. We disagree.
 {¶ 18} We note an objection to the manner of questioning the witness was not made. An error not raised in the trial court must be plain error for an appellate court to reverse. State v. Long (1978),53 Ohio St.2d 91; Crim.R. 52(B). In order to prevail under a plain error analysis, appellant bears the burden of demonstrating that the outcome of the trial clearly would have been different but for the error.Long. Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." Id. at paragraph three of the syllabus. *Page 6 
 {¶ 19} The victim, Ramona Young, testified for the state. Ms. Young is appellant's live-in girlfriend. Ms. Young described the incident and her recollection of it as follows:
 {¶ 20} "A. Well, I threw a barbecue that day. Randy had left that morning.
 {¶ 21} "Q. Okay.
 {¶ 22} "A. And I had threw a barbecue. There was a lot of people that came over. When he came back, a few friends came around. I had an argument with one of these guys, and I told him about the argument. Then he left again. When he came back, the big fight started. Everybody was drunk, on drugs, but a big fight started. He got to wrestling and tussling with these other guys. A few of them left. I told all my friends to leave. I called the police, I had the phone in the bathroom. I don't know what happened after that. And then in the kitchen, we in the kitchen, my bathroom is right by my kitchen, Randy and these other guys are still wrestling. One guy leave, a gun is pulled out, I'm wrestling with the gun with the guys and I get shot. I call 911. I'm on drugs, 911 is called. I picked up my phone, I said, where the police at? They said they still on their way. They say — I said, I've been shot. They said, who shot you? And I said his name.
 {¶ 23} "Q. You said whose name?
 {¶ 24} "A. Randy's." T. at 206-208.
 {¶ 25} The state then confronted Ms. Young and claimed she had changed her story:
 {¶ 26} "Q. Okay. Now, Ramona, is it fair to say that the testimony you're giving today is not the same as what you told the police that night? *Page 7 
 {¶ 27} "A. Well, what you want me to say, ma'am? I was on cocaine, I was on alcohol, and I had just got shot for the first time in my life. And today I won't be able to tell you that I can actually remember everything that was actually said to the police that night. Now, that's fair to say.
 {¶ 28} "* * *
 {¶ 29} "Q. So you're telling this jury that you don't remember what you told the police that night?
 {¶ 30} "A. I'm telling this jury, yes, because drugs and alcohol do affect your memory, and it has been a little bit over two months ago. That's why it's important that you write a statement or something. Nothing was taken from me.
 {¶ 31} "Q. Isn't it true Randy put the gun in the vanity, underneath the vanity?
 {¶ 32} "A. No, I put the gun there. And I told the people — somebody that called me about this case because I had put it there. The gun — after the gun was wrestled out and I got shot, the gun in the sink, the wrestling was done by the sink. If you knew how my house was made, my bathroom is directly by the sink.
 {¶ 33} "Q. Okay.
 {¶ 34} "A. Directly by it. Now the gun is in the sink, I put the gun in the bathroom.
 {¶ 35} "Q. And isn't it true that he took the magazine out of the gun?
 {¶ 36} "A. The magazine, meaning the clip?
 {¶ 37} "Q. Yes.
 {¶ 38} "A. I don't know who took the clip out the gun. I was shot at this time, ma'am. First time shot, scared, nervous, I'm not trying to pay attention to what's going *Page 8 
on with the clip nor the gun. When I seen the gun in the sink, I threw it in the bathroom because that's where I was shot at.
 {¶ 39} "Q. Did you see Randy take the bullet out of the gun and put it into the charcoal grill?
 {¶ 40} "A. No, I did not because the charcoal grill was on the back porch and Randy was handcuffed and laid out on the ground by the police in our driveway." T. at 209-211.
 {¶ 41} The testimony continued as follows:
 {¶ 42} "Q. Okay. And when you called 911, you recall telling the dispatcher that he [Randy] shot you?
 {¶ 43} "A. Yeah, at the end, yes.
 {¶ 44} "Q. Several times?
 {¶ 45} "A. No.
 {¶ 46} "Q. You don't recall telling them —
 {¶ 47} "A. I know for a fact I didn't tell them several times that he shot me. No.
 {¶ 48} "Q. If I play the 911 tape, would that refresh your memory?
 {¶ 49} "A. Play the 911 tape. You playing the whole thing from when the police was called an hour before they got there?
 {¶ 50} "(Thereupon, the audiotape was played for the jury.)
 {¶ 51} "Q. Ramona, does that refresh your memory of how many times you told the police that he shot you — *Page 9 
 {¶ 52} "A. Yeah, I didn't say Randy. He was in there wrestling with a couple people. I said, he shot me, he shot me. I didn't say Randy until the end. I don't know who in the hell shot me by that time.
 {¶ 53} "* * *
 {¶ 54} "Q. Okay. Now, since this incident, is it fair to say that you've spoken with Randolph?
 {¶ 55} "A. Yeah, it's fair to say because I didn't press any charges for none of this stuff.
 {¶ 56} "Q. Okay.
 {¶ 57} "A. Not for Randy, not for whoever the guys was there. Yes, it's fair to say because I still love him, he's my boyfriend." T. at 214-215.
 {¶ 58} Ms. Young admitted she refused to talk to anyone from the Prosecutor's Office, including a victim's advocate, about the incident. T. at 216-217.
 {¶ 59} Because there was no objection, the record does not develop whether the state was surprised by the testimony; however, the record does indicate Ms. Young refused to talk to anyone from the state's office.
 {¶ 60} Evid.R. 607 governs impeachment and states the following:
 {¶ 61} "(A) Who may impeach
 {¶ 62} "The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage. This exception does not apply to statements admitted pursuant to Evid. R. 801(D)(1)(a), 801(D)(2), or 803. *Page 10 
 {¶ 63} "(B) Impeachment: reasonable basis
 {¶ 64} "A questioner must have a reasonable basis for asking any question pertaining to impeachment that implies the existence of an impeaching fact."
 {¶ 65} On cross-examination, Ms. Young admitted someone shot her and it was either Randy or another guy. T. at 228, 232.
 {¶ 66} The testimony of Ms. Young was disconnected and jumbled at best and clearly evasive to the state. We cannot say after a review of the entire testimony that the limited questioning on Ms. Young's prior statements was plain error.
 {¶ 67} Assignment of Error II is denied.
 III {¶ 68} Appellant claims his conviction was against the manifest weight of the evidence. We disagree.
 {¶ 69} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Martin (1983),20 Ohio App.3d 172, 175. See also, State v. Thompkins, 78 Ohio St.3d 380,1997-Ohio-52. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Martin at 175.
 {¶ 70} Appellant was convicted of felonious assault in violation of R.C. 2903.11 which states the following:
 {¶ 71} "(A) No person shall knowingly: *Page 11 
 {¶ 72} "(1) Cause serious physical harm to another;
 {¶ 73} "(2) Cause or attempt to cause physical harm to another by means of a deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code."
 {¶ 74} Appellant was also convicted of domestic violence in violation of R.C. 2919.25 which states, "(A) No person shall knowingly cause or attempt to cause physical harm to a family or household member."
 {¶ 75} Appellant argues his convictions were not supported by the evidence because Ms. Young could not say who shot her. It is undisputed that Ms. Young was shot in the leg and appellant was Ms. Young's live-in boyfriend. The issue presented at trial was who shot Ms. Young.
 {¶ 76} In the cool light of day, after realizing her boyfriend had been charged, Ms. Young cannot say who shot her. However, the 911 tape and her excited utterances to the police at the scene contradict her recollection at trial. The record establishes Ms. Young told appellant that a third party (an individual named Glen) had disrespected her in her home and they had engaged in a verbal argument. T. at 207, 219-221. Appellant "gets pissed" and left, only to return later with another individual. T. at 220-221. Ms. Young's friend Fred said something about one of her cousins and everyone started arguing. T. at 221-222. A physical altercation took place between appellant and two individuals (one was Fred), a gun was brandished and fired, and Ms. Young was shot. T. at 207, 224-225, 227. At the scene, Ms. Young said she knew who shot her, and identified appellant to the police. T. at 174, 246; Plaintiff's Exhibit 5. *Page 12 
 {¶ 77} The jury was confronted with Ms. Young's obvious change of heart or as she described it, she did not file a complaint against appellant or anyone else, contra to her own assertions at the crime scene.
 {¶ 78} We note the weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. State v.Jamison (1990), 49 Ohio St.3d 182, certiorari denied (1990),498 U.S. 881. We cannot say the jury lost its way when it had the choice of determining Ms. Young's prior credibility vis-À-vis her credibility on the witness stand.
 {¶ 79} Upon review, we find the jury did not lose its way, and find no manifest miscarriage of justice.
 {¶ 80} Assignment of Error III is denied.
 {¶ 81} The judgment of the Court of Common Pleas of Stark County, Ohio is hereby affirmed.
By Farmer, P.J.
Wise, J. and
 Edwards, J. concur. *Page 13 
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Stark County, Ohio is affirmed.